### UNITED STATES v. MINIDOKA & S. W. R. CO. et al.

(Circuit Court, D. Idaho, C. D. February 8, 1910.)

1. PUBLIC LANDS (§ 50½,* New, Vol. 9, Key No. Series)—RAILROAD RIGHT OF WAY—LANDS SUBJECT.

Lands within a reservation withdrawn under the reclamation act (Act June 17, 1902, c. 1093, 32 Stat. 388 [U. S. Comp. St. Supp. 1909, p. 596]) for the furtherance of an irrigation project and resting under valid, subsisting homestead filings are no longer "public lands," and are therefore

exempt from the operation of the railroad right of way act (Act March 3, 1875, c. 152, 18 Stat. 482 [U. S. Comp. St. 1901, p. 1568]), granting to railroad companies rights of way through the public lands of the United States.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 6, pp. 5793–5795; vol. 8, p. 7772.]

**2.** Public Lands (§ 7*) — Irrigation — Reclamation Project — Railroad Right of Way—Injunction.

Rev. St. § 2288, amended by Act March 3, 1905, c. 1424, 33 Stat. 991 (U. S. Comp. St. Supp. 1909, p. 537), provides that a bona fide settler under the pre-emption, homestead, or other settlement law may transfer by warranty against his own acts any portion of his claim for a railroad right of way, which transfer shall not vitiate his right to complete and perfect title to his claim. *Held* that, where homestead claimants within land withdrawn for a reclamation project transferred land to a railroad company for a right of way, the fact that the entryman might forfeit or abandon his entry did not constitute such an interest in the land as to entitle the government to an injunction restraining the railroad company from constructing its railroad across the lands and canals embraced in the reclamation project.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 7; Dec. Dig. § 7.*]

**3.** Public Lands (§ 135*)—Railroad Right of Way—Homestead Entries— Reclamation Project.

The right to transfer land for a railroad right of way conferred on a bona fide settler under the pre-emption, homestead, or other settlement law by Rev. St. § 2288, amended by Act March 3, 1905, c. 1424, 33 Stat. 991 (U. S. Comp. St. Supp. 1909, p. 537), applies to homestead land within a reclamation district, and hence the United States, after such transfer, is only entitled to have the railroad so constructed as not to interfere with the irrigation, reservoirs, ditches, and canals.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 354; Dec. Dig. § 135.*]

**4.** Public Lands (§ 135*)—Homestead Entry—Railroad Right of Way— Conveyance by Entryman.

That the United States may in the future reasonably require rights of way for ditches, in furthering a reclamation project, in addition to those now occupied by existing canals, and that it may be entitled to reserve land therefor under General Appropriation Act Aug. 30, 1890, c. 837, 26 Stat. 391 (U. S. Comp. St. 1901, p. 1570), providing that, in all patents for land thereafter taken up under the United States land laws on entries west of the one hundredth meridian, land shall be expressly reserved for a right of way for ditches and canals constructed by the authority of the United States, did not prevent a railroad company from occupying lands in præsenti legally conveyed to it within a reclamation reservation by a homestead entryman.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 354; Dec. Dig. § 135.*]

In Equity. Suit by the United States against the Minidoka & Southwestern Railway Company and another. Application for temporary injunction. Granted in part.

C. H. Lingenfelter, U. S. Atty., and B. E. Stoutemyer, for the United States.

P. L. Williams and D. Worth Clark, for defendants.

---

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

DIETRICH, District Judge. This is an application for a temporary injunction restraining the defendant from completing the construction of its railroad across certain lands and canals embraced in the Minidoka. reclamation project, in Cassia county, Idaho. The substantial facts are not in dispute, and the questions of law arise upon the construction and application of the general railroad right of way act of March 3; 1875 (Act March 3, 1875, c. 152, 18 Stat. 482 [U. S. Comp. St. 1901, p. 1568]), granting to railroad corporations rights of way through "the public lands of the United States," a paragraph of the general appropriation act, approved August 30, 1890 (Act Aug. 30, 1890, c. 837, 26 Stat. 391 [U. S. Comp. St. 1901, p. 1570]), providing "that in all patents for lands hereinafter taken up under any of the land laws of the United States or on entries or claims validated by this act west of the one hundredth meridian, it shall be expressed that there is reserved from the lands in said patent described, a right of way thereon for·ditches or canals constructed by the authority of the United States," an act amending section 2288 of the Revised Statutes of the United States, approved March 3, 1905 (Act March 3, 1905, c. 1424, 33 Stat. 991 [U. S. Comp. St. Supp. 1909, p. 537]) which is as follows: "Any bona fide settler under the pre-emption, homestead, or other settlement law shall have the right to transfer, by warranty against his own acts, any portion of his claim for church, cemetery, or school purposes, or for the right of way of railroads, telegraph, telephones, canals, reservoirs, or ditches for irrigation or drainage across it; and the transfer for such public purposes shall in no way vitiate the right to complete and perfect the title to his claim"—and the reclamation act, approved June 17, 1902 (Act June 17, 1902, c. 1093, 32 Stat. 388 [U. S. Comp. St. Supp. p. 596]).

The reclamation act, appropriating for the irrigation of arid lands in certain states and territories the proceeds of the sales of public lands situate therein, directs the Secretary of the Interior to cause examinations and surveys to be made for the purpose of determining the feasibility of any given project, and authorizes him to "withdraw from public entry the lands required for any irrigation works contemplated" under its provisions; and it further authorizes him, "at or immediately prior. to the time of beginning the surveys for any contemplated irrigation works, to withdraw from entry, except under the homestead laws, any public lands believed to be susceptible of irrigation from said works." It is also provided that public lands which it is proposed to irrigate "shall be subject to entry only under the provisions of the homestead laws, in tracts of not less than forty nor more than one hundred and sixty acres, and shall be subject to the limitations, charges, terms, and conditions" in the act prescribed. These terms and limitations are that the Secretary of the Interior may confine the entry of any one person to such an area, not less than 40 nor more than 160 acres, as in his opinion may·be reasonably required for the support of a family; that the commutation provisions of the general homestead laws shall not apply; that the entryman shall pay in the manner and at the times prescribed by the Secretary of the Interior a ratable proportion of the cost of the irrigation works; and that he shall pay the

charges for construction of the irrigation works apportioned against his tract, and reclaim at least one-half of the total irrigable area of his entry for agricultural purposes before receiving patent. It will be observed that the act provides for two different "withdrawals" or "reservations," to be made by the Secretary of the Interior. As is said in United States v. Hanson, 167 Fed. 881, 93 C. C. A. 371:

"It provides, first, that the Secretary may withdraw from public entry such lands as are required for the actual occupation of the reclamation service. This is for such purposes as reservoirs, canals, pumping works, etc. No exception whatever is expressed as to the lands which are to be withdrawn for these purposes. It provides, second, for the withdrawal of any other public lands 'believed to be susceptible of irrigation from said works.' Such lands are to be withdrawn from entry, 'except under the homestead laws.'"

Briefly, and omitting the recital of dates and details, the facts are that prior to the organization of the defendant railroad company the Secretary of the Interior, acting under authority of the reclamation act, established the Minidoka project, and entered upon the construction of the works for the irrigation of the lands embraced therein. Certain lands were withdrawn or reserved for the use of the government, for its dams, pumping plant, canals, and other structures; but none of the lands so reserved are here involved. There were also withdrawn from entry, "except under the homestead laws," other public lands, aggregating a large area, "believed to be susceptible of irrigation" from the contemplated works. Soon thereafter all the lands of the latter class were entered by qualified persons under the provisions of the general homestead law, modified and limited, as hereinbefore stated, by the reclamation act. These entries were made at various dates, some of them several years prior to the commencement of this action, but none of them have as yet progressed to final proof or patent. The defendant railroad company projected a branch road, connecting with an existing line at the town of Burley, and traversing in its course for a distance of approximately six miles lands thus covered by homestead entries, and in the possession of the several entrymen, and also intersecting three of the project canals constructed and controlled by the reclamation service. Apparently for the purpose of claiming some benefit under the railroad right of way act of March 3, 1875, prior to the commencement of this suit and after the definite location of its line of road, the railroad company filed with the Secretary of the Interior a copy of its articles of incorporation and proofs of its organization under the same. It has not, however, filed any profile map with the register of the local land office. Recognizing the possession and rights of the homestead entrymen, the defendant, before it commenced to grade its roadbed, much work upon which has now been done, negotiated with the entrymen, and, by purchase, secured from them, so far as lay within their power to grant, the desired right of way. There are two or three entrymen with whom negotiations are still pending, but that fact is unimportant, for the entrymen are not complaining, and the defendant fully concedes the necessity of extinguishing their claims, either by purchase or by proceedings in eminent domain. There has been no interference by the defendant with the complainant's canals, and there is a disavowal of any purpose

or intent to make or to claim the right to make any crossing which will diminish their capacity or impair their safety, or materially restrict the complainant's management and control thereof.

From this brief statement it is apparent that complainant's application for injunctive relief rests upon two classes of property rights which, it is alleged, the defendant is threatening to invade—its interest in the lands which are in the possession of the several entrymen, but to which it holds the legal title, and its rights in the canals which it has constructed across these lands, and of which it has the exclusive possession. First, as to the lands.

At the argument there was considerable discussion touching the question whether or not lands withdrawn under the reclamation act from entry, "except under the homestead laws," are subject to the operation of the railroad right of way act of March 3, 1875, the plaintiff affirming, and the defendant denying, that such lands are within the exception of section 5, which provides that the act shall not apply to "lands especially reserved from sale." But the question does not seem to be pertinent at the present juncture; for whatever may be the legal status of the lands so withdrawn under the reclamation act, after withdrawal and prior to entry, all of the lands here involved rest under valid subsisting homestead filings, and being, therefore, no longer "public lands," they are exempt from the operation of the right of way act, which, by its express terms, is made applicable only to "public lands of the United States." Bardon v. Northern Pacific Railroad Co., 145 U. S. 535, 12 Sup. Ct. 856, 36 L. Ed. 806. And whether we take the one view or the other of the ensuing rights of the parties, when and in the contingency that a present entryman shall forfeit or abandon his entry covering lands traversed by the defendant's railroad, the anticipation of such a possible occurrence furnishes no substantial basis for present injunctive relief. In either view, the rights of the railroad company upon the happening of such a contingency would be measured by the law. They will not be enlarged by the possession of the railroad company, however long continued, for, as against the government, neither acquiescence nor lapse of time may be pleaded in bar. It follows that if the right of way act does not become applicable upon the cancellation of an existing entry, and, if the railroad company holds under no other pertinent provision of law, the plaintiff may, as soon as the land is released from entry, without prejudice assert all the rights of an owner against one who, without right, holds possession of its property. If, upon the other hand, the right of way act will in such a contingency operate to effect a grant of the right of way to the defendant, a court of equity, without other reason for so doing, cannot at this time properly enjoin the defendant from putting itself in a position where it may without wrongdoing secure the benefits of a valid law.

The primary inquiry, therefore, relates to the present, rather than the future, rights of the several parties in interest—such rights as are created and defined by the acts hereinbefore referred to, exclusive of the railroad right of way act. I say the several parties in interest, because, while the controversy is in form between the government and

the railroad company, its adjudication necessarily involves a consideration of the rights of the homestead settlers, who have entered the lands and assumed certain obligations, and who, in turn, are entitled to receive such reciprocal benefits and to exercise such valuable privileges as are provided for by law; and, as will presently appear, between an entry subject to legal limitations, such as are implied by the complainant's contention, and an entry measuring up to the defendant's view of the law, there is a distinction which the entryman may not unreasonably regard as highly material. The original homestead law was enacted for the purpose of encouraging settlement upon the public domain, the essential conditions to the acquisition of title being that the entryman should make his home upon the land, and improve and cultivate it. Right of possession and the duty of occupation follow the initiation of the entry, and from that time until the title is fully earned the entryman may make such uses of the land as are within the spirit and general purpose of the homestead law, all the time with due regard to the rights of the government, still the owner of the principal estate. The entryman may not commit waste or use the resources of the land except in so far as may be reasonably necessary to effect the lawful object of his possession, nor may he occupy the land or permit its occupancy for a purpose inconsistent with the general purpose of tillage and home making. By strict requirement the entry can be made only for the use and benefit of the entryman, and is nontransferable; nor may any part of the entry be alienated, either by voluntary contract or by judicial sale. It follows that under the law as originally enacted the entryman could not legally use or permit another to use any part of his entry for railroad purposes, nor could he make a conveyance for such purpose. The practical necessity for making certain exceptions to these rigid restrictions upon the power of the entryman must have soon become apparent, and was doubtless brought to the attention of Congress, for we find that by the act of March 3, 1873 (Rev. St. U. S. § 2288), the entryman was authorized to transfer by warranty against his own acts any portion of his entry for church, cemetery, or school purposes, and for the right of way of railroads, all of which, as appears from the statute, were deemed to be "public purposes," and later, by the amendatory act of March 3, 1895, authority to transfer was extended to rights of way for telegraph and telephone lines, and for irrigation canals and reservoirs, which are also declared to be public purposes. And, if we will but for a moment contemplate the plight of a community made up of settlers upon public lands entered under the homestead laws, where no one has the power to convey or to acquire a site for a school house or a church or a cemetery, or a right of way for a railroad or a telegraph or telephone line, or, in an arid region, for an irrigating ditch, both the reasons for this legislation and the objects and purposes thereof will clearly appear.

By its express terms the act confers upon "any bona fide settler under the pre-emption, homestead, or other settlement law" the right to transfer for a railroad right of way, and, while its application to an entry under the homestead law, as modified by the reclamation act, is here apparently denied by the government, no good reason is offered, and, as I view it, no substantial reason can be brought forward for

refusing such an entryman the benefit thereof. In terms the act is all inclusive, for even were the suggestion of counsel for the government to be adopted, that the entries under consideration are not, strictly speaking, to be deemed homestead entries, we still have the express provision that "any bona fide settler under * * * (any) other settlement law" may make a transfer, and this declaration is, beyond all peradventure, broad enough to include the entrymen of the lands in question. Moreover, if by reason of any ambiguity the language of the act were subject to construction, no reason is to be found in the general policies of the government, or in the scope and purpose of the reclamation act, for narrowly construing this law, to the exclusion of entries within reclamation projects. The purpose of the reclamation act is identical with that of the original homestead act. It is but an adaptation of the original act to conditions not in contemplation at the time of the earlier legislation. It encourages and makes possible the settlement and tillage of large tracts of public lands, and, to say the least, it is quite as important that settlers upon such lands, as that settlers upon lands more easily reclaimed and improved, have schools, churches, cemeteries, telephones, telegraphs, and convenient means of transportation. Yet it was practically conceded at the argument by counsel for the government that, if the settlers here cannot by their consent authorize the construction of a railroad across their several entries, then there is no way provided by law by which such right may be granted; for if, as is contended on behalf of the government, and as is here held, the general right of way act of March 3, 1875, is not applicable under the existing conditions, and if the act now under consideration is likewise inapplicable, then, so far as I am advised, there is no law either granting a right of way or vesting in any officer or department the authority or discretion to make a grant of such a right of way, or legally to consent to occupancy for such purpose. And it follows that, if the settlers have not the power to grant such right of way for railroad purposes, neither have they the power to convey sites for school houses or churches or cemeteries, or rights of way for ditches or for telegraph or telephone lines.

If, then, as I think must be held, the entrymen here are entitled to the full benefit of this legislation, it is proper next to consider the nature and effect of an authorized conveyance for one of the public purposes specified in the law. It is, of course, possible so literally to construe the law as to confine the operation of the conveyance therein provided for strictly to the entryman's estate. Such a construction would, however, necessarily imply that the entryman is simply authorized to execute a worthless instrument, for the grantee could not obtain any benefits thereunder without first extinguishing the rights and divesting the title of the government, conditions with which it is admittedly impossible to comply. The entryman could convey a site for a schoolhouse, but actual use of such site for school purposes would constitute a trespass against the United States; and settlers might convey a right of way for a railroad, but it would be unlawful for the grantee to construct a roadbed and lay a railroad track thereon.

Is it to be supposed that Congress intended thus to "keep the word

of promise to the ear and break it to the hope"? The law must receive a sensible construction, to the end that its underlying purpose may be given practical effect and its general objects accomplished. As has already been stated, this legislation was first enacted in 1873; and soon thereafter, in 1875, Congress passed the general right of way act, providing for the acquisition of rights of way across public lands and over possessory claims upon public lands. Appreciating the desirability, if not the necessity, of having railroads penetrate and traverse the public domain upon which settlement was being encouraged, Congress doubtless purposed, by these acts, to make ample provision for the acquisition of rights of way across all lands (excepting those reserved for special purposes) in which it had any interest, and which would be encountered in making the desired extensions of railroad lines. It is reasonable to assume that the two acts were deemed to be sufficient to accomplish this purpose. By the act of March 3, 1875, it expressed its willingness freely to grant such rights of way over lands where the government was the owner of the entire interest, and there is no reasonable ground to suppose that it was unwilling to grant similar rights of way over lands in which the interest of the government was limited. And it is further to be remarked that if at the time of the passage of the act of 1875 it was understood that the act of 1873, together with conveyances made in pursuance thereof, was insufficient to authorize the grantee to occupy and use the right of way for the purposes specified in the grant, it is strange that Congress, while granting, without charge, rights of way over lands which were exclusively public, did not also include lands, similarly situated, in which the public had only a reversionary interest. From these considerations the conclusion is unavoidable that, subject to the entryman's conveyance, the act of 1905, if it does not operate as a grant of the government's interest, at least authorizes occupancy and use for the purposes specified in the conveyance during the life of the entry. What rights the railroad company may have in case its grantor, an entryman, abandons his entry, need not at this time be determined. That may be a matter of future concern to the defendant, but it is of no present interest to the plaintiff; for, if we adopt the view least favorable to it, and hold that it is not a grantee, but only a licensee, still as a licensee merely, the defendant's present occupancy and use are fully authorized by law, and the plaintiff's contention that it is a trespasser must therefore fail.

It is suggested that, if this view prevails, it will be entirely possible for an entryman to impair the security of the government for the repayment to it of the cost of the irrigation works by granting rights of way to such an extent that the land will be rendered valueless for agricultural purposes. But such a peril is more fanciful than real. The danger from a possible epidemic of competitive railroad building may, it is thought, be treated as a negligible consideration, and as for a road or two, as was said by the Supreme Court in Railroad Company v. Baldwin, 103 U. S. 426, 26 L. Ed. 578, the "lands would not be less valuable for settlement by a road running through them. On the contrary, their value would be greatly enhanced thereby."

It is further suggested that in carrying to completion its projected

176 F.—49

irrigation system the government may in the future reasonably require rights of way for ditches in addition to those now occupied by existing canals, and that these lands, being west of the one hundredth meridian, are subject to the reservation in the act of August 30, 1890, the material provision in which is hereinbefore set forth, requiring that there be expressed in patents for lands lying west of the one hundredth meridian a reservation of rights of way for ditches and canals "constructed by authority of the United States." But the rights of the United States by virtue of this provision are no greater before than after patent, and it may well be doubted whether the contention would be made that a railroad company holding a deed from the patentee, for a right of way across lands the patent to which contains such a reservation should, at the instance of the government, and solely because of such reserved easement, be enjoined from using its right of way. Assuming for present purposes the correctness of the construction heretofore placed upon the law by this court, in Green v. Willhite (October 31, 1906) 160 Fed. 755, and by the Supreme Court of Idaho, in Green v. Wilhite, 14 Idaho, 238, 93 Pac. 971, it does not follow that because of the reservation in favor of the government the patentee and his grantee must refrain from occupying or using the land pending the selection and location by the government of needful rights of way. The reservation is sufficiently onerous if it be limited to the purposes for which it was intended, and those purposes require only that the absolute possession and dominion of the owner yield to the needs of the government when and to the extent that they actually arise. There is no reason why in the meantime the land should lie idle, or that either the entryman or his grantee should be prohibited from making any legitimate use thereof. It is, of course, assumed that the reservation loses none of its force by reason of a transfer by the entryman or patentee; and, that being the case, is there any more reason for enjoining the defendant from laying its track across the land than for restraining the entryman from building his fences or planting his crops, or digging his ditches? In either case, unless some other statute intervenes, the rights of the government by reason of the reservation, whatever they may be, must, as the public needs arise, necessarily prevail; and the peril of occupancy for railroad purposes would therefore appear to be to the defendant rather than to the plaintiff.

Passing to the second branch of the case, the crossing of the plaintiff's canals, it is found that the controversy involves not so much the general principles of law by which the rights and obligations of the parties are to be measured as the practical application of these principles to the particular facts. The government, having rightfully located and constructed its canals, is, like any other proprietor, entitled to be protected against any unlawful interference with their maintenance and use; and this general right the defendant in terms concedes. Upon the other hand, it is taken for granted that the Secretary of the Interior, at whose instance presumably the suit was commenced, is actuated only by the motives of a fair-minded and prudent owner, and is seeking, not to obstruct the building of the railroad, but only to be protected against loss and peril by reason of its construction. In a

large sense the Secretary of the Interior in building and operating these canals acts as the trustee for the settlers, upon whom primarily rests the burden of their cost, and into whose hands their control will ultimately pass; and it will therefore be assumed that he desires to encourage and not to impede the execution of a work which admittedly is of general interest, and will be of general benefit to the entrymen; provided that and so long as the work is carried forward in such manner as not to injure or imperil the project and property which it is his specific duty to protect. These canals extend through the country at great length, and obviously intolerable inconvenience would be entailed, not only upon the entrymen whose lands are crossed, but upon the public at large, if bridges should be denied for the passage of ways either public or private. Such crossings, whether of wagon roads or of railroads, should, of course, be made without expense or loss to the owner of the canals, and in such manner as not to impair or imperil their efficiency, or increase the burden of their maintenance. Precautions for safety should be taken with a full appreciation of the irreparable loss which may ensue upon the occurrence of a break in the banks of a large canal, especially when such break happens during the height of the irrigating season; and in case of a railroad crossing there is the additional important consideration of the peril to life and property in case the roadbed should be washed out or weakened by the escaping waters.

If, then, such are the general principles by which the rights and obligations of the parties are to be measured, it would appear to be the duty of the court at the present time not absolutely to prohibit the defendant from extending its railroad across the plaintiff's canals, but only to restrain it from making the crossings in such a manner as to infringe upon the plaintiff's rights by diminishing the capacity or impairing the safety of the canals, or unnecessarily increasing the burden of their maintenance, and that is the course which will be pursued. At the present time, however, the record does not furnish sufficient data to enable the court intelligently to formulate an order properly specifying the manner of making the crossings, and, upon the statement of counsel for the railroad company in open court that no work will be done affecting the canals until further order, the hearing will be continued a reasonable length of time to enable the parties to reach an agreement, covering the conditions which should be imposed upon the defendant, failing in which a further hearing will be had for the purpose of enabling the court intelligently to prescribe such conditions.