(January 28, 1911.)

## MINIDOKA & SOUTHWESTERN RAILROAD COMPANY, Respondent, v. F. E. WEYMOUTH et al., Appellants.

[113 Pac. 455.]

PUBLIC LANDS—RAILROAD RIGHT OF WAY—GOVERNMENT EASEMENT— CONSTRUCTION OF STATUTE.

(Syllabus by the court.)

1. Lands withdrawn under the act of Congress of June 17, 1902, known as the Reclamation Act, for the purposes of irrigation under an irrigation system constructed by the government, and which lands are subject to homestead entry under the act of Congress, are public lands within the meaning of the act of March 3, 1875, known as the Railroad Right of Way Act, and are subject to railroad rights of way for any railroad company which complies with the provisions of the act.

2. The act of Congress of August 30, 1890, reserving to the government an easement for ditches and canals over all lands west of the 100th meridian, which might thereafter be patented by the government to any entryman, does not apply to railroad rights of way acquired under the provisions of the act of March 3, 1875.

    3.   The act of Congress of August 30, 1890, which refers to lands "taken up," and land "entries," and lands "patented," does not refer to or include *easements* and *rights of way* granted for specific purposes where the fee does not pass and where no patents are issued and where the amount of land covered by the easement is not limited in area or extent.

    4.   The acts of Congress relative to the public lands providing for entries thereof and authorizing easements and rights of way thereover must be construed together and in the light of the conditions of the country as they existed when the several acts were passed, as well as to the purposes declared by the acts, and force and effect should be given to the provisions of each and every act in so far as it is possible to do so.

APPEAL from the District Court of the Fourth Judicial District, for Lincoln County.   Hon. Edward A. Walters, Judge.

Action by the plaintiff for an injunction.   Judgment and order for the plaintiff.   Defendant appealed.   *Affirmed.*

C. H. Lingenfelter and B. E. Stoutemeyer, for Appellants.

"The words of a private grant are taken most strongly against the grantor.   But this rule is reversed in cases of public grants.   They are construed strictly in favor of the government on grounds of public policy."   (Lewis' Sutherland Stat. Const., par. 548; *Mills v. St. Clair Co.,* 8 How. (U. S.) 581, 12 L. ed. 1201; *Binghampton Bridge,* 3 Wall. (U. S.) 51, 18 L. ed. 137; *State v. Bentley,* 23 N. J. L. 532, 538; *Slidell v. Grandjean,* 111 U. S. 412, 4 Sup. Ct. 475, 28 L. ed. 321; *Hannibal R. R. Co. v. Packet Co.,* 125 U. S. 260, 271, 8 Sup. Ct. 874, 31 L. ed. 731; *Mayor v. Ohio etc. R. R.,* 26 Pa. 355; *San Francisco v. Sharp,* 125 Cal. 534, 58 Pac. 173; *Globe v. Bellingham Co.,* 10 Wash. 458, 38 Pac. 112; *Central Transp. Co. v. Pullman Co.,* 139 U. S. 24, 11 Sup. Ct. 478, 35 L. ed. 55; *Coosaw Co. v. South Carolina,* 144 U. S. 550, 12 Sup. Ct. 689, 36 L. ed. 537; *L. & N. R. R. v. Kentucky,* 161 U. S. 677, 16 Sup. Ct. 714, 40 L. ed. 849; *Wisconsin Central v. United States,* 164 U. S. 190, 17 Sup. Ct. 45, 41 L. ed. 399; *Long Island Co. v. Brooklyn,* 166 U. S. 685, 17 Sup. Ct. 718, 41 L. ed. 1165.)

Even if the plaintiff could be considered to have acquired a valid title to the right of way claimed by it, its title was certainly acquired under the land laws of the United States after the passage of the act of Congress of August 30, 1890, and it is subject to the provisions of that act.

Under this statute the right of the government to construct the ditch in question has been fully affirmed by the Land Department of the United States in 36 Land Dec. 482, by this court in the case of *Green v. Wilhite,* 14 Ida. 238, 93 Pac. 971, and by the federal court of this district in a case of the same name referred to and quoted in the Idaho decision.

"A certification of land to the state for the benefit of a railroad.company under the acts of Congress by the Land Department of the United States has the same legal effect as a patent." (*United States v. Winona & St. P. R. Co.,* 67 Fed. 948, 15 C. C. A. 96.)

An examination of the public land statutes of the United States shows that Congress has uniformly used the term "sale" in its proper and generally accepted meaning as defined by the supreme court in the case of *Williamson v. Berry,* and always in connection with a transfer of title under the various acts authorizing the transfer of title upon payment of a purchase price. But it is equally noticeable that the term "sale" is never used in those acts of Congress which authorize and regulate the entry of land under the homestead law, such entries not being regarded as sales, but as a gift or bounty from the government to the settler.

If any uncertainty ever existed as to what lands are regarded as lands sold by Congress and what lands are lands reserved from sale, it has been removed by the decision of the supreme court in the case of *Iowa v. McFarland,* 110 U. S. 471, 4 Sup. Ct. 210, 28 L. ed. 198.

Where lands are granted by an act of Congress which does not require the issuance of a formal patent, the certificate of the Commissioner of the General Land Office, or Secretary of the Interior, or other government officer named in the statute is the legal equivalent of a patent. (*Frasher*

*v. O'Connor,* 115 U. S. 102, 5 Sup. Ct. 1141, 29 L. ed. 311; *McCreery v. Haskell,* 119 U. S. 327, 7 Sup. Ct. 176, 30 L. ed. 408; *Curtner v. United States,* 149 U. S. 662, 13 Sup. Ct. 1041, 37 L. ed. 890.)·

''Where the language of a statute is dubious and open to different interpretations, the established construction of it by the department of the government charged with its execution will have very great force, and generally a controlling one in an interpretation given by the court.'' (*St. Paul M. & M. R. Co. v. Phelps,* 137 U. S. 528, 11 Sup. Ct. 168, 34 L. ed. 767; *Bissell v. Penrose,* 8 How. (U. S.) 317, 12 L. ed. 1095; *United States v. Mayes,* 12 Wall. (U. S.) 177, 20 L. ed. 381; *United States v. Healey,* 160 U. S. 136, 16 Sup. Ct. 247, 40 L. ed. 369; *Sturr v. Beck,* 133 U. S. 541, 10 Sup. Ct. 350, 33 L. ed. 761.)

P. L. Williams and D. Worth Clark, for Respondent.

The land in question was not taken out of the category of public lands by the withdrawal made by the Secretary of the Interior; the land was not withdrawn from entry, or especially reserved from sale. Under this law two forms of withdrawal are provided for. (*United States v. Hanson,* 167 Fed. 881.)

The words ''public lands'' have long had a settled meaning in the legislation of Congress, and when a different intention is not clearly expressed, the term ''public land'' is used to designate such land as is subject to sale or other disposal under the general laws. (*Newhall v. Sanger,* 92 U. S. 761, 23 L. ed. 769; *Bardon v. Nor. Pac. R. R. Co.,* 145 U. S. 535, 12 Sup. Ct. 856, 36 L. ed. 806; *Doolan v. Carr,* 125 U. S. 618, 8 Sup. Ct. 1228, 31 L. ed. 844; *Cameron v. United States,* 148 U. S. 301, 13 Sup. Ct. 595, 37 L. ed. 459; *Mann v. Tacoma Land Co.,* 153 U. S. 273, 14 Sup. Ct. 820, 38 L. ed. 714; *Barker v. Harvey,* 181 U. S. 481, 21 Sup. Ct. 690, 45 L. ed. 963; *Scott v. Carew,* 196 U. S. 100, 25 Sup. Ct. 193, 49 L. ed. 403.)

Unless rights of way for railroads may be procured by compliance with the act of March 3, 1875, then no right of

way may be acquired across lands situated within the boundaries of a reclamation project. (*United States v. Minidoka & Southwestern R. Co.,* 176 Fed. 762.)

In view of the fact that provision is made for obtaining rights of way over forest and other reservations, it must be apparent that Congress did not consider any necessity for such provisions in cases of reclamation projects, because certainly Congress would not have knowingly left the law in such a condition that rights of way for various public enterprises might not be acquired across public lands situated within reclamation project boundaries. Such a construction would defeat the object of the law, to wit, the settlement and cultivation of these lands. (*In re Frank Laughrin,* 29 Land Dec. 147.)

Public grants are construed strictly against the grantee, but they are not so construed as to defeat the intent of the legislature, or to withhold what is given by necessary or fair implication. (*United States v. Denver & R. G. R. Co.,* 150 U. S. 14, 14 Sup. Ct. 11, 37 L. ed. 975, and cases cited.)

Under these grants the question of the reasonable amount of land necessary for such use is not open to consideration and determination by the courts. The grant by Congress of a right of way one hundred feet on each side of the central line of the track was a conclusive determination of the reasonable and necessary quantity of land to be dedicated to such use, and carried with it the right of possession in the grantee therein named and its successor. (*Oregon Short Line R. Co. v. Quigley,* 10 Ida. 770, 80 Pac. 401; *Northern. Pac. R. Co. v. Smith,* 171 U. S. 268, 18 Sup. Ct. 794, 43 L. ed. 160; *New Mexico v. United States Trust Co.,* 172 U. S. 171, 19 Sup. Ct. 881, 43 L. ed. 407.)

It is indispensable to a correct understanding of a statute to first inquire what object is intended to be accomplished by it. When the subject matter is once clearly ascertained, and its general intent, a key is found to all its intricacies. (2 Sutherland, p. 379.)

AILSHIE, J.—This action was prosecuted by the Minidoka & Southwestern Railway Co. for the purpose of obtaining

an injunction restraining the defendants from trespassing upon and permanently occupying a part of the respondent's railroad right of way between the towns of Rupert and Burley in Lincoln county. The judge of the trial court made an order and granted a writ enjoining and restraining the defendants, and they thereupon prosecuted this appeal.

The Minidoka & Southwestern Railroad Co. is a corporation organized and existing under the laws of the state of Idaho and operating between Minidoka and Twin Falls. In the year 1902, the Secretary of the Interior made an order withdrawing a large tract of land under the provisions of sec. 3 of the act of June 17, 1902 (32 Stat. 388, U. S. Comp. St. Supp. 1909, p. 597), which is commonly known as the Reclamation Act. The land withdrawn is now commonly known as the Minidoka Reclamation Project. The respondent's right of way from Rupert to Burley lies over and across this project. The order of the Secretary of the Interior with reference to these lands had the effect of withdrawing them from sale or entry under any of the laws of the United States excepting the homestead laws, and as to homestead entries, such entries were not subject to the commutation provisions of the general laws. The respondent corporation was organized in 1904, and about February of that year filed with the Secretary of the Interior a copy of its articles of incorporation and due proof of its organization and also profile maps or plats of definite location of its proposed line of road, which were accepted and approved by the Secretary of the Interior August 10, 1904, and thereafter, and in the same year, the respondent actually constructed its road upon the ground, the center line of its right of way corresponding to the center line of the railroad track as the same was actually constructed on the ground. Subsequently the government, through its agents and employees, began the construction of its canals and ditches for the reclamation of the lands previously withdrawn, and in course of their construction they entered upon the respondent's right of way and within the fence inclosing the same, and began excavating and building a line of ditch and canal

along and parallel with the respondent's railroad track. This action was instituted to enjoin the appellants from trespassing upon and permanently occupying the right of way. The respondent defended its action upon the ground that under the provisions of the act of Congress of August 30, 1890 (26 Stat. 391, U. S. Comp. St. 1901, p. 1570), the government had reserved the right to enter upon and construct ditches and canals over and across any lands west of the 100th meridian that might be granted or patented to any entryman subsequent to the date of the act.

The railroad company filed a copy of its articles of incorporation and due proof of its organization, together with a profile map of its road under and in accordance with the provisions of the act of March 3, 1875 (18 Stat. 482, U. S. Comp. St. 1901, p. 1568), known as the Railroad Right of Way Act of Congress. This map and plat was accepted and approved by the Secretary of the Interior and the proper notations made in accordance with the provisions of the act. If the land over which the company claims a right of way, and subsequently built its road, was at the time "public lands of the United States," then the company would, on a compliance with the provisions of the act, be entitled to a right of way 200 feet wide or, as the act states, "100 feet on each side of the central line of said road."

It is contended by counsel for the government that under the provisions of sec. 5 of the act of March 3, 1875, the railroad company could not lawfully acquire a right of way across this reclamation project after the withdrawal of the lands for reclamation purposes. It is argued that after the withdrawal the lands were no longer "public lands of the United States," and were not, therefore, subject to the provisions of the Right of Way Act. Sec. 5 of the act of March 3, 1875, provides as follows: "That this act shall not apply to any lands within the limits of any military, park or Indian reservation, or other lands especially reserved from sale. . . . ." It is argued that since the lands of a reclamation project after being withdrawn are no longer subject to *sale* for any purpose and are not subject to disposition under

any law of Congress except for homestead purposes, they are consequently not subject to the provisions of the Right of Way Act. If the word "sale" as here used is employed in a strict and technical sense, then the contention is undoubtedly sound; but if used in a general sense, implying any disposition of the lands by or on the part of the government, then, of course, the argument is unsound. The nature of the enumerations contained in section 5 indicates to my mind that the words "reserved from sale" are used in a general sense, and are intended to mean "reserved from disposition by or on the part of the government," whether it be of actual sale, as that term technically signifies, or from entry under any of the laws of Congress or any disposition thereof which might be made by the Secretary of the Interior. This construction is reinforced by the enumeration which precedes it, namely, that the act shall not apply to any lands "within the limits of any military, park or Indian reservation." Now, it is at once apparent that the lands in military, park and Indian reservations are not sold. They are simply set aside for these special purposes. Again, the reason of the exception and reservation should be considered. There would be no more reason, apparently, for making the reservation apply to lands that were subject to homestead only than there would be for applying it to lands that were not subject to "sale" within the literal and technical meaning of that term.

But for the purposes of this case we are not inclined to go into a technical analysis of the language employed, for the reason that the railroad company actually complied with the provisions of the act of March 3, 1875, and sought to acquire its right of way under and by virtue of that act, and the Secretary of the Interior approved the application and permitted the company to enter upon and construct its railroad over and across this project and to take possession of the right of way claimed, and thereby held that the lands were "public lands" subject to the operation of the act of 1875. The company, in accordance therewith and upon the

faith of the act of Congress and the action of the Secretary
of the Interior, actually constructed its road upon the
ground, and has ever since been operating the same over this
right of way. For these reasons we do not feel disposed to
enter upon any very critical analysis of the acts of Con-
gress granting the railroad company the right to cross the
lands of this reclamation project. We are of the opinion,
however, that the lands were such "public lands" as the
Railroad Right of Way Act applies to, and that the company
regularly acquired a right of way through the lands em-
braced within the Minidoka Reclamation Project. A some-
what similar view of the statute has apparently been taken
by the federal court for the district of Idaho in *United States
v. Minidoka & S. W. R. Co.*, 176 Fed. 762.

The provision of the act of August 30, 1890, under which
the government claims the right to enter upon respondent's
right of way and construct ditches and canals, is a para-
graph that was added to the Sundry Civil Appropriation
Act of that date, and reads as follows:

"  . . . . That in all patents for lands hereafter taken up
under any of the land laws of the United States or on en-
tries or claims validated by this act west of the one hun-
dredth meridian, it shall be expressed that there is reserved
from the lands in said patent described, a right of way
thereon for ditches or canals constructed by the authority
of the United States. . . . ."

It is contended by the government that this proviso or
reservation applies to all lands, rights of way and easements
granted by the government under any act of Congress what-
ever, and that this is true whether the grant was for *a special
purpose or for general purposes*, while the railroad company
contends, on the other hand, that this reservation contained
in the act of August 30, 1890, was never intended to apply
to a railroad right of way granted under the act of March
3, 1875, and that an attempt to apply it to that act and
the right of way acquired under the provisions thereof,
would defeat the purposes of the Right of Way Act and would
be inconsistent with the spirit of both acts.

We have heretofore had occasion to pass upon this provision of the act of Congress, in *Green v. Wilhite*, 14 Ida. 238, 93 Pac. 971, and there held that the right of way reserved to the government for the construction of ditches and canals over lands granted and patented by the government applies to works commenced and ditches and canals constructed at any time subsequent to the issuance of patent. The only question, therefore, upon which we must now pass is whether or not this provision of the act of August 30, 1890, can be reasonably construed to reserve to the government a right of way for ditches and canals through, over or across railroad rights of way acquired under the provisions of the act of March 3, 1875.

In the first place, an examination of the debates which took place in Congress at the time of the passage of the act of August 30, 1890 (Vol. 21, Cong. Rec., pp. 7269–7987, 8270 and 9156), discloses no reference whatever to rights of way over public lands either for railroads or ditches and canals for "mining, agriculture, manufacturing, or other purposes." On the contrary, these debates all had reference to lands "entered" or "taken up" by settlers and purchasers for usual and general purposes other than special purposes, such as rights of way for railroads, ditches and canals, millsites, etc.

When we come to consider the language of the act itself, we find that all its terms have special reference to lands "taken up" and lands on which "entries" are made and for which "patents" are issued. All these terms indicate a purpose to deal with land to which the government grants the absolute fee, and which are conveyed in quantity or bulk by legal subdivisions and indicate no purpose to refer to special and qualified estates or easements granted by Congress for definite and specific purposes. No patent is ever issued for a railroad right of way or a ditch or canal easement across the public domain, and while that fact would not relieve the grant from liability to use by the government for canal purposes if, in fact, the law subjects it to such burden, still it affords a strong indication that the Congress was legislating

with reference only to such lands as are patented, as distinguished from easements and rights of way for specific purposes and for which no patents are issued.

It is also worthy of note, and throws some light on the legislative intent, to observe that under the act of August 30, 1890, it was provided that, "No person who shall after the passage of this act, enter upon any of the public lands with a view to occupation, entry or settlement under any of the land laws, shall be permitted to acquire title to more than three hundred and twenty acres in the aggregate, under all of said laws." It is at once apparent that this limitation as to the amount of land that can be entered could not apply to a railroad right of way, for the reason that rights of way are not taken by the acre and are not limited to any number of acres, but are merely limited by the width of the right of way and the extent or length of the road. It might require one hundred acres or it might be one thousand acres. The foregoing provision of the act is valuable in consideration of this case only in that it denotes the class of lands to which it was intended the act should apply, and this also indicates that it was lands that might be entered or on which settlement might be made, and clearly had reference to the settler, homesteader or purchaser of the public lands as distinguished from easements and rights of way.

The statutes should be construed together and in such a reasonable way as to give meaning and force to each provision thereof and render each effective and operative. To hold, however, that the act of August 30, 1890, applies to rights of way acquired under the act of March 3, 1875, would entirely defeat the objects of the latter act every time and at every place the government might see fit to construct a ditch or canal. And if the government can take any part of such right of way without compensation for ditch or canal purposes, under this act, it can take the whole right of way and thus wipe out the right of way, stop the operation of the railroad and defeat the purpose of the Right of Way Act.

Sutherland, in his work on Statutory Construction, at sec. 218, announces what we conceive to be the correct rule to apply in construing a statute. He says:

"It is indispensable to a correct understanding of a statute to inquire first what is the subject of it, what object is intended to be accomplished by it. When the subject matter is once clearly ascertained and its general intent, a key is found to all its intricacies; general words may be restrained to it, and those of narrower import may be expanded to embrace it to effectuate that intent. When the intention can be collected from the statute, words may be modified, altered or supplied so as to obviate any repugnancy or inconsistency with such intention."

In applying this rule to the construction of land grants, the supreme court of the United States, in *United States v. Denver & Rio Grande R. R. Co.,* 150 U. S. 14, 14 Sup. Ct. 11, 37 L. ed. 975, said:

"It is undoubtedly, as urged by the plaintiffs in error, the well-settled rule of this court that public grants are construed strictly against the grantee, but they are not to be so construed as to defeat the intent of the legislature, or to withhold what is given either expressly or by necessary or fair implication."

In *Winona & St. P. R. R. Co. v. Barney,* 113 U. S. 618, 5 Sup. Ct. 606, 28 L. ed. 1109, Mr. Justice Field, speaking for the court said:

"The acts making the grants are to receive such a construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance. To ascertain that intent we must look to the condition of the country when the acts were passed, as well as to the purposes declared on their face, and read all parts of them together."

Applying this rule of construction, we are strongly of the opinion that it was not the intent or purpose of the act of

Congress of August 30, 1890, to include railroad rights of way within the operation of that act.

Counsel for appellant have called our attention to a letter of instructions from Acting Secretary Pierce to the directors of the reclamation service, under date of June 6, 1908 (36 Land Dec. 482) in which he construed the act of August 30, 1890, as applying to a railroad right of way, acquired under the act of March 3, 1875. The acting secretary holds that railroad rights of way are necessarily granted and acquired under the land laws of the United States, and that the act of 1875 is as much a land law as any other law of Congress, which authorizes the disposition of any other public lands. He concludes, therefore, that the government may appropriate a railroad right of way for the purpose of constructing its ditches and canals under the Reclamation Act.

The reasoning employed by the acting secretary fails to appeal to us as being sound and logical. It seems to overlook the true spirit and purpose of these several acts, and especially of the act of 1875, under which the respondent acquired its right of way.

While any opinion promulgated by the Department of the Interior, touching the public domain, is entitled to much weight and constitutes a strong persuasive force with this court, yet we are not bound by the decisions of that department in a case of this kind, and since the acting secretary's communication fails to convince us of the correctness of his construction, we are impelled to decline to follow it.

As we have heretofore observed, if the government can take any part of this right of way without condemnation for the construction of ditches and canals, it can take the whole of it. On the other hand, if it needs any part of the right of way which is not actually occupied by the railroad company and necessary to the use and operation of its road, it has already a means of acquiring the same under the statutes of

eminent domain.   That remedy is both ample and speedy in this state.

The order appealed from should be affirmed, and it is so ordered.   Costs are awarded to respondent.

Stewart, C. J., concurs.

SULLIVAN, J., Dissenting.—I am unable to concur in the conclusion reached by my associates.   The Railroad Right of Way Act of March 3, 1875, by sec. 5 of its provisions, does not apply to "military, park, or Indian reservations or other lands *especially reserved from sale."*   Under the act of June 17, 1902, known as the Reclamation Act, the land in the Minidoka Project was withdrawn from sale and was not subject to any kind of entry or sale except under the homestead law as modified by said act and to the extent that it prohibited the commutation of homestead entries.   The land in that project was "especially reserved from sale," hence the Railroad Right of Way Act of 1875 does not apply; or, if it applies in any manner whatever, it is subject to the reservations applicable to homestead entries.

The act of August 30, 1890, among other things, provides as follows:

"That in all patents for lands hereafter taken up under any of the land laws of the United States or entries or claims validated by this act west of the one hundredth meridian, it shall be expressed that there is reserved from the lands in said patent described, a right of way thereon for ditches or canals constructed by the authority of the United States."

That provision applies to all lands there referred to taken under any of the land laws of the United States.   While it refers to "patents" for lands, it clearly applies to any and all lands taken up by private persons or corporations under any of the land laws of the United States.   Railroads procure their titles, such as they get, which is a base fee, to rights of way and station grounds under the act of 1875, and it is clear to me that railroad companies come within the reserva-

tions provided in said act of 1890, as the object and purpose of the government was not to permit any entries or to grant any rights to lands so reserved that would in any way interfere with the construction of canals and ditches over any land that had been withdrawn for the purpose of reclamation by the government.

In the opinion of my associates, it is stated: "If the word 'sale' as here used (referring to the Railroad Right of Way Act of 1875) is employed in a strict and technical sense, then the contention (of appellant) is undoubtedly sound; but if used in a general sense, implying any disposition of the lands by or on the part of the government, then, of course, the argument is unsound." And then the opinion proceeds to hold that the term "reserved from sale" does not mean "sale" at all, and says: "There would be no more reason apparently for making the reservation apply to lands subject to homestead only than there would be for applying it to lands that would not be for sale within the literal and technical meaning of that term." While there may be no more reason for making said reservations apply to lands subject to sale than to homestead, Congress has specifically declared that the land laws which provide for the sale of public lands do not apply, and expressly provides that only homestead entries apply to such lands, which entries are all subject to the reservations made for the construction of canals and ditches for the reclamation of such land.

In *Williamson v. Berry*, 8 How. (U. S.) 544, 12 L. ed. 1188, it is held that the word "sale" is a word of precise legal import both in law and equity. "It means at all times a contract between parties, to give and pass rights of property for money, which the buyer pays or promises to pay to the seller for the thing bought or sold."

An examination of the public land laws of the United States shows that Congress has uniformly used the term "sale" in its proper and generally accepted meaning as defined by the supreme court of the United States in the case above cited, and always in connection with a transfer of title under the pre-emption law, the Timber and Stone Act,

the desert land law, the acts providing for the sale of abandoned military reservations and isolated tracts and other acts authorizing the transfer of title upon payment of a purchase price. It is notable that where the term "sale" is used in the public land laws, it always refers to a transfer of title in exchange for the payment of a purchase price, and it is noticeable that the word "sale" is never used in those acts of Congress which authorize and regulate the entry of land under the homestead laws. Such entries are not regarded as "sales," but as gifts or bounty from the government to the settler. The term "sale" is employed in each of the following acts of Congress in the sense above contended for: The act of June 3, 1878, c. 151, 20 Stat. 89 (U. S. Comp. St. 1901, p. 1545), commonly called the Timber and Stone Act; the act of March 3, 1877, c. 107, 19 Stat. 377 (U. S. Comp. St. 1901, p. 1548), entitled "An act to provide for the sale of desert lands in certain states and territories"; secs. 2353, 2354, 2355, 2356, 2357, Rev. Stats.; sec. 2 of act of May 18, 1898, c. 344, 30 Stat. 418 (U. S. Comp. St. 1901, p. 1447) ; secs. 2358, 2359, 2360, 2365 and 2381, Rev. Stats. (U. S. Comp. St. 1901, pp. 1447, 1448, 1449, 1455). In the acts of Congress authorizing and governing entries under the homestead law, the term "sale" is never used, such entries not being considered as "sales." Secs. 2289, 2290, and 2291, Rev. Stats. (U. S. Comp. St. 1901, pp. 1388, 1390), and act of June 17, 1902 (Reclamation Act).

The provisions of sec. 2357, Rev. Stats. (U. S. Comp. St. 1901, p. 1444), furnishes a test for determining whether the lands withdrawn under the Reclamation Act are "offered for sale" or "reserved from sale." It provides:

"The price at which the public lands are offered for sale shall be one dollar and twenty-five cents an acre, and at every public sale, the highest bidder, who makes payment as provided in the preceding section, shall be the purchaser; but no land shall be sold either at public or private sale for a less price than one dollar and twenty-five cents an acre; and all the public lands which are hereafter offered at public sale according to law and remain unsold at the close of such

public sales shall be subject to be sold at private sale, by entry at the land office, at one dollar and twenty-five cents an acre, to be paid at the time of making such entry; *provided,* that the price to be paid for alternate reserved lands along the line of railroads within the limits granted by any act of Congress shall be two dollars and fifty cents per acre.''

Those provisions refer to lands subject to sale. The lands withdrawn from entry under the Minidoka Project are reserved from any and every kind of sale. They cannot be purchased at any price; they are not lands ''offered for sale,'' but are lands ''reserved from sale.''

In the case of *Iowa v. McFarland,* 110 U. S. 471, 4 Sup. Ct. 210, 28 L. ed. 198, the court had under consideration an act which provided for the admission of the state of Iowa into the Union, and an act authorizing the admission of the state of Illinois, both acts declaring that five per cent of the net proceeds of land lying within the state and afterward sold by Congress should be reserved and appropriated for certain public purposes in the state, and it is there held that the words ''lands sold by Congress'' were limited to public lands lying within the state belonging to the United States at the time of the admission of the states into the Union, which were actually sold by Congress for a pecuniary consideration, and did not include lands that were not sold for a pecuniary consideration.

It was held in *Adams v. Church,* 193 U. S. 515, 24 Sup. Ct. 512, 48 L. ed. 769, that the homestead is a gift from the government to the homesteader. (See, also, *Anderson v. Carkins,* 135 U. S. 488, 10 Sup. Ct. 905, 34 L. ed. 272.)

Some stress is laid upon the fact that in the Reclamation Act it is provided that certain reservations must be contained in the ''patent,'' and that a railroad company under the Railroad Right of Way Act of 1875 does not get a patent. There is nothing in that contention. The right of way is a grant from the government, and no formal patent is required to be issued therefor, but the railroad company, upon compliance with the law, acquires the same right under the law, and has the same title that it would get provided a formal

"patent" was issued. Those lands which are granted by act of Congress which do not require the issuance of a formal "patent" are as effectually conveyed by the government as if a formal "patent" had been issued, and such a grant is equivalent to a "patent." (*Frasher v. O'Connor*, 115 U. S. 102, 5 Sup. Ct. 1141, 29 L. ed. 311; *McCreery v. Haskell*, 119 U. S. 327, 7 Sup. Ct. 176, 30 L. ed. 408.)

In the case of *Curtner v. United States*, 149 U. S. 662, 13 Sup. Ct. 1041, 37 L. ed. 890, the court had under consideration a railway right of way. Chief Justice Fuller, in the opinion of the court, said:

"The grant was *in praesenti*, and attached upon the filing of a map of definite location. When the identification of a granted section became so far complete as to authorize the grantee to take possession, the legal title of the granted land passed, and an action for possession could be maintained by the company or its grantees before the issue of a patent. The patent would have been evidence that the land named was granted, that the grantee had complied with the conditions of the grant, and that the grant was to that extent relieved from the possibility of forfeiture for breach of its conditions but was not essential to transfer the legal right.

"The company had on February 1, 1870, whatever title it could obtain, and whatever rights belonged to it, and its cause of action then accrued. The land had already been certified to the state by the Commissioner of the General Land Office and the Secretary of the Interior, and their action in that regard was in law the same as if patents had been issued to the state."

It is there in effect held that upon the filing of the map of definite location and approval by the Secretary of the Interior that the action of the Commissioner of the General Land Office and the Secretary of the Interior in that regard was, in law, the same as if patents had been issued for the right of way. There is no question but that upon complying with the statute in reference to the location of a railway right of way over the public domain subject to such locations, after the law has been complied with by the railroad company

and the Commissioner of the General Land Office and the Secretary of the Interior, the railway has as good a title to such right of way as it would if a patent had issued therefor. However, the Secretary of the Interior could not make a railroad right of way valid over land not subject to such right of way, by approving a plat.

In regard to the construction of statutes, my associates quote from Sutherland on Statutory Construction, sec. 218, as follows: "It is indispensable to the correct understanding of a statute to first inquire what is the subject of it, what object is intended to be accomplished by it. When the subject matter is once clearly ascertained and its general intent, a key is found to all its intricacies." Applying that rule to the Reclamation Act referred to, we will inquire first what object was intended to be accomplished by said Reclamation Act. The first object and purpose was to reclaim the land reserved from sale by constructing canals and ditches over the same, and to prevent any entries of the land that would in any manner interfere with the construction of such canals and ditches. One object and purpose was to construct such canals and ditches at the least possible expense to the homesteader, and to accomplish that purpose the said land is reserved from entry under any of the land laws of the United States that would in any manner increase the cost of the construction of such canals and ditches or in any manner delay or interfere with the speedy construction thereof. And it was important not to permit any entries of any kind after the lands were reserved, whereby rights of way for canals and ditches would have to be purchased either by contract or condemnation proceedings. It was the object and purpose to thus prevent long delays which are required in condemnation suits to procure a right of way for such canals and ditches. Hence, under the only entry by which any such lands could be taken, a reservation was made for a right of way for ditches and canals across all such lands, thus preventing delay and expense. The intention, so far as the government work in constructing such canals and ditches is concerned, is thus clearly ascertained, the intent clearly

being to prohibit the entry of any of such land without a reservation of a right of way for canals and ditches. The object intended to be accomplished was the reclamation of the land at as little expense as possible, and one method of accomplishing that was not to permit any of the land to be entered, either for railroad rights of way or for homestead purposes without such reservation. My associates construe said Reclamation Act and the Railroad Right of Way Act of 1875 against the homesteader and the government: against the homesteader, as every right of way required to be purchased across the railroad right of way must be paid for by the homesteader and thus make the water more expensive to him; and against the government by construing said grants strictly against the government instead of strictly against the grantee, according to the well-established rule of construction in such matters. It is held by the supreme court of the United States in many cases that the words of a private grant are taken most strongly against the grantor, but this rule is reversed in cases of public grants. Such grants are strictly construed in favor of the government on grounds of public policy.    (2 Lewis' Sutherland on Statutory Construction, sec. 548.)

A grant of a right of way to a railroad company under the act of March 3, 1875, after the passage of the Reclamation Act of August 30, 1890, across land reserved under the provisions of said Reclamation Act, is burdened with the reservations for a right of way for canals and ditches as provided by said act. I think Acting Secretary Pierce, in his instructions to the director of the reclamation service, June 6, 1908 (36 Land Dec. 482), correctly states the purpose of that provision of the Reclamation Act which reserves a right of way for ditches and canals constructed by the authority of the United States. He says:

"The purpose of this provision was to reserve to and retain in the United States a right of way over all lands within the territory mentioned which may be disposed of under any of the land laws of the United States after the passage of said act, and although it is declared that such reservation shall

be expressed in the patent, it does not follow that the reservation is less effective as to lands which are disposed of under land laws not requiring or authorizing the issuance of patents as evidence of the right of the grantee. . . . .

"The act of March 3, 1875, is one of the land laws of the United States general in its operation. It is not a grant to a particular corporation but to any corporation duly organized which shall comply with the conditions prescribed by the act. Under this act 'a railroad company becomes specifically a grantee by filing its articles of incorporation and due proofs of its organization with the Secretary of the Interior.' (*Jamestown & N. R. R. Co. v. Jones,* 177 U. S. 125, 130 [20 Sup. Ct. 568, 44 L. ed. 698].) . . . .

"The act of June 17, 1902, authorizes the Secretary of the Interior to construct works for the storage, diversion and development of waters; to appropriate lands required for the construction and operation of such works, and to withdraw from all form of entry and disposal, except under the homestead law, lands believed to be susceptible of irrigation from such works."

I think Assistant Secretary Pierce there sets forth clearly the correct construction of the acts of Congress referred to.

It is clear to me that it was not the intent of Congress to grant to the railroad companies rights that were not granted to the homestead entrymen on land reserved by the government for reclamation.

The trial court erred in granting said injunction. The injunction ought to be dissolved and the government permitted to proceed with its work without any interference from the railroad company.