## CURTNER v. UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 258. Argued April 24, 25, 1893. — Decided May 15, 1893.

When, in a suit in equity brought by the United States to set aside and cancel patents of public land issued by the Land Department, no fraud being charged, it appears that the suit is brought for the benefit of private persons and that the government has no interest in the result, the United States are barred from bringing the suit if the persons for whose benefit the suit is brought would be barred.

When a land-grant railroad company conveys a part of its grant without having received a patent from the United States, and it appears that the United States had issued a patent of the tract to a State, as part of a land grant to the State, and the State parts with its title to an individual, the relative rights of the parties can be determined by proceedings in the courts on behalf of the grantees of the company, against the grantees of the State.

THIS was a bill in equity filed by the United States in the Circuit Court of the United States for the Northern District of California, July 23, 1883, against Henry Curtner and others,

patentees of the State of California, for the purpose of having
certain listings of indemnity school lands, situated in that
State in township three south, range three east, and in town-
ship two south, range one east, set aside and cancelled and
the lands decreed to be held subject to the grant made for
the purpose of aiding the construction of the Pacific Railroad,
as provided in the acts of Congress of July 1, 1862, and July
2, 1864.

The bill was demurred to and amended, and to the amended
bill a demurrer was interposed, which was overruled, Judge
Sawyer delivering an opinion. 11 Sawyer, 411.

The bill averred that on July 1, 1862, Congress passed an
act by which the Union Pacific Railroad Company was incor-
porated for the purpose of constructing a railroad and telegraph
line from the Missouri River to the Pacific Ocean, and by
which it was provided that "there be, and is hereby, granted to
the said company, for the purpose of aiding in the construction
of said railroad . . . . every alternate section of public
land, designated by odd numbers, to the amount of five alter-
nate sections per mile on each side of said railroad, on the
line thereof, and within the limits of ten miles on each side
of said road, not sold, reserved, or otherwise disposed of by
the United States, and to which a preëmption or homestead
claim may not have attached, at the time the line of said road
is definitely fixed. . . . And all such lands, so granted
by this section, which shall not be sold or disposed of by said
company within three years after the entire road shall have
been completed, shall be subject to settlement and preëmption,
like other lands, at a price not exceeding one dollar and
twenty-five cents per acre, to be paid to said company," 12
Stat. 489, 492, c. 120; that the Central Pacific Railroad Com-
pany of California was, by the act, declared entitled to the
benefit of this land grant, on the same terms and conditions
as the Union Pacific Railroad Company; that on October 31,
1864, the Central Pacific Railroad Company of California
assigned to the Western Pacific Railroad Company the right
to ea n the land grant along and through the location where
ı nd in controversy is situated; and that this assignment

was ratified by act of Congress of March 3, 1865. 13 Stat. 504, c. 89.

It was further alleged that, by the act of July 1, 1862, the railroad company seeking the benefit of the grant therein provided for, was required, within two years after its passage, to file a map of its general route in the Department of the Interior, and thereupon the Secretary of that department should cause the lands within fifteen miles of such general route to be withdrawn from preëmption, private entry, and sale ; that when any portion of said route was finally located, the Secretary of the Interior should cause the said lands so granted to be surveyed and set off as fast as might be necessary for the purposes therein named, 12 Stat. 493 ; and that, by the act of July 2, 1864, the time for filing the general route map was extended to July 1, 1865.    13 Stat. 356, c. 216. By this act the fifteen-mile limit was enlarged to twenty-five and the five alternate sections to ten, and by its fourth section it was provided that "any lands granted by this act, or the act to which this is an amendment, shall not defeat or impair any preëmption, homestead, swamp land, or other lawful claim."

That a map of the general route of the road was filed in the Department of the Interior on December 8, 1864, and that the Secretary of that department, on January 30, 1865, caused the lands within twenty-five miles of such general route to be withdrawn from preëmption, private entry, and sale ; that the land in controversy was within those limits; that on February 1, 1870, the map of the line of the road, as definitely fixed, was filed with the Secretary of the Interior; and on that day the line of the road was definitely fixed; that on December 29, 1869, the road was completed in all respects as contemplated by said act of Congress, and the Western Pacific Railroad Company was entitled to have and receive patents from the United States for the land in controversy, the same being within ten miles of the road so completed, and not sold, reserved, or otherwise disposed of by the United States.

And also that the Western Pacific Railroad Company and

the Central Pacific Railroad Company of California became consolidated on June 22, 1870, under the name of the Central Pacific Railroad Company, and that the said Western Pacific and its successor, the Central Pacific, did, within three years of the completion of the said road, sell and dispose of the land in controversy to persons other than the defendants.

The bill then averred that "the Commissioner of the General Land Office did, at the various and respective times hereinafter stated, without right and through error, inadvertence, and mistake, wrongfully list, by certified lists thereof, to the State of California, the said above described lands," and then follow four lists covering the lands in controversy, dated September 8, 1870; March 11, 1871; November 15, 1871; and March 24, 1873.

That on May 12, 1874, the railroad company by its deputy land agent presented to the register and receiver of the local land office a selection of lands claimed by it under its grant, numbered thirteen, including these lands; that the "mistake, error, and inadvertence of the said Commissioner of the General Land Office in listing by certified lists said land to the State of California was not discovered by complainants or its officers of the said Land Department or by said Central Pacific Railroad Company or its grantees until the 12th of May, 1874, nor could the same by reasonable diligence have been discovered sooner; that thereupon said register and receiver wrongfully and in violation of their duty refused to certify said list as aforesaid requested and refused to certify the same in any manner whatever."

It was further alleged "that the State of California did, at various times subsequent to said eighth (8th) day of September, A.D. 1870, by its land patents purport to convey said lands mentioned in said list to divers and sundry persons other than ' the Western Pacific Railroad Company ' or its successors, the Central Pacific Railroad Company, and against the will and without the consent of the said companies or either of them, as follows, to wit : " and then follow the dates of the patents, the lands patented, and the names of the patentees, the dates being February 3, 1871; April 3, 1871; November 29, 1871;

May 18, 1872; and March 4, 1878, respectively; and that the patentees subsequently to the issue of the patents by the State to them, respectively, and prior to the commencement of this action, "did by valid mesne conveyances, duly executed and acknowledged, convey all their right, title, and interest in and to said lands to the defendants herein."

The bill further averred that the lands so patented by the State were on July 1, 1862, November 30, 1862, July 2, 1864, October 5, 1864, January 30, 1865, and December 29, 1869, alternate sections of the public lands of the United States, and were within the limits of the railroad grant, and had not been sold, or reserved, or otherwise disposed of by the United States, and that no preëmption or homestead claim had attached thereto at the time the line of the road was definitely fixed; that the President of the United States refused to issue patents to the railroad company for said lands, " not because the said Western Pacific Railroad Company and its successor had not complied with the said acts of Congress, nor because it was not the kind and description of land granted, but solely because said land had previously been by mistake, wrongfully and inadvertently listed to the State of California as hereinbefore set forth; " and that the defendants and their grantors at the time mentioned in the bill "had actual notice of the said grant of said lands to said company, the said withdrawal thereof, the said erroneous and unlawful listing thereof by the said error, inadvertence, and mistake of the said Commissioner, and of each and all of the matters and things hereinbefore set forth."

The bill then set forth various steps taken by the railroad company to procure patents from the Interior Department notwithstanding the listings to the State, and among other things that on March 18, 1879, the register and receiver at San Francisco reported that in accordance with instructions of January 24, 1878, they had, on February 25, 1878, made demand on the State of California for the surrender of the certification of the lands hereinbefore described, and that no surrender had been made; that they also reported on the same day that in accordance with instructions of March 9,

1878, they furnished the State surveyor general, on March 26, 1878, with a copy of said instructions and made demand on the State of California to surrender her title and listing of said lands, but that up to that date she had failed to surrender as requested; that on April 2, 1879, the reports were submitted to the Secretary of the Interior, and on the 26th of June the Secretary affirmed the Commissioner's decision of March 9, 1878, awarding the land to said company, but refusing to issue patents for the reason that said land had been wrongfully listed to the State of California. On December 8, 1879, the Secretary of the Interior transmitted to the Commissioner a letter from the attorney general of California, dated April 1, 1878, refusing to relinquish the certification and listings of said lands theretofore listed and certified to the State by the Commissioner; that afterwards a petition was filed in the General Land Office for a reconsideration of so much of the Secretary's decision of June 26, 1879, as declined to issue to the railroad company patents for the lands that by mistake were wrongfully listed and certified to the State of California, and thereafterwards the papers were sent to the Secretary, who on July 1, 1882, requested the opinion of the Attorney General of the United States whether patents could then be issued for the lands, or whether the certification to the State must be first judicially vacated; that on October 18, 1882, the Secretary of the Interior wrote to the Commissioner of the General Land Office, enclosing a copy of the Attorney General's opinion, and directing the papers to be prepared for a suit to set aside the listing and certification to the State, and thereafterwards, on December 6, 1882, the Secretary requested the Attorney General to commence suit in the proper court.

The bill then charged that a demand was duly made by the United States upon the State, February 25, 1878, and refused, and that the United States were bound in equity and good faith to hold the Central Pacific Railroad Company, its grantees and assigns, harmless from the consequences of errors and mistakes, and particularly those relating to the mistake and inadvertence of the Commissioner of the General

Land Office. The bill further averred that proceedings had been continuously pending before the Land Department for the purpose of correcting the error and mistake, and had been prosecuted with due diligence and in accordance with the usages of the department in relation to such matters. It was further stated that prior to December 6, 1882, it had been the practice of the department to issue second patents to claimants of land whenever it was made to appear that the first patent had been wrongfully issued.

The prayer was that " the said listings of said lands to the State of California as aforesaid be set aside, recalled, cancelled, and annulled, and that all the defendants herein be forever estopped and forbidden from asserting any right or title to said lands, and that the same in said decree be declared to be public lands of the United States of America, subject to said rights of the Central Pacific Railroad Company, its grantees and assigns, as hereinbefore set forth;" and for general relief.

Answers having been put in, evidence taken, and hearing had, a decree was rendered, which annulled the listings and certifications to the State, adjudged the patents issued to the State to be void, and enjoined the defendants from asserting any title under them.

*Mr. E. R. Taylor* and *Mr. Michael Mullany* for appellants. *Mr. Henry F. Crane* was on *Mr. Taylor's* brief.

*Mr. A. B. Browne* for appellees. *Mr. F. H. Waterman, Mr. A. T. Britton* and *Mr. Solicitor General* were on his brief.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The lands in question were odd sections lying within the twenty-mile limit of the grant of lands made to the Central Pacific Railroad Company to aid in the construction of its road, and situated partly in township three south, range three

east, Mount Diablo base and meridian, and partly in township two south, range one east.

It is stated in the opinion of the Circuit Court, rendered on the final hearing, and reported, 38 Fed. Rep. 1, that " between May 15, 1863, and. May 16, 1864, after actual survey in the field, but before the survey had been officially adopted or recognized by the Secretary of the Interior, and before it had been approved by the surveyor general and filed in the district land office, the State of California, by its locating agent, made selections and locations of all the lands now in controversy in township three, range three, in part satisfaction of the grant to the State of lands in lieu of sections 16 and 36, under the act of March 3, 1853, 10 Stat. 244, 246, c. 145. Between February 17, 1864, and February 9, 1866, the State had issued its certificates of purchase to. the several purchasers thereof, the first payments of the purchase money having been made. The selections, apparently at their respective dates, were by the register of the land office entered in his office. A portion of these lands was certified over to the State by the Land Department at Washington, approved by the Secretary of the Interior on November 15, 1871, and the remainder on March 24, 1873, and they were afterwards patented to the purchasers by the State. The lands in controversy, situate in said township two, range one, were selected in advance of any survey in the field by the United States surveyor general, upon surveys made by the county surveyors of the State, between July 28, 1862, and July 20, 1863. Certificates of sale were issued to. purchasers by the State for a part between March 2, 1863, and January 25, 1864, and for the remainder between February 20 and March 14, 1865. These selections were entered by the register of the land office on June 12, 1865. A part was certified over to the State by the Secretary of the Interior on September 8, 1870, and the rest on March 11, 1871. These lands were also afterwards patented to the purchasers by the State." In the view which we take of the case, this summary of the evidence in the particulars mentioned may for convenience be accepted without restatement.

The map of the general route of the railroad company was

filed in the General Land Office, December 8, 1864, and the order of withdrawal issued January 30, 1865. The road was completed December 29, 1869, and the map of definite location filed February 1, 1870. The selections of the railroad company embracing these lands were made May 12, 1874. The bill alleges, and the record shows, that patents for all but three hundred and twenty acres of the lands were issued to persons mentioned in the bill, from November 9, 1870, up to and including April 5, 1873, and that the three hundred and twenty acres were patented by the State to one of such persons March 4, 1878. The purchasers from the State and their grantees entered into actual occupation of the lands in controversy under their certificates of purchase, and from that time on had continued in the possession of the same. This suit was commenced July 23, 1883, over twelve years and eight months after the first patent issued, and over five years and four months after the issue of the last-named patent.

The Circuit Court held that lands are not surveyed lands by the United States until a certified copy of the official plat of survey has been filed in the local land office; that this had not been done in respect of these lands, or, if done, that the filing was too late; that they were therefore unsurveyed, and that the selections, being made on unsurveyed lands, were "utterly void." These premises were denied by appellants, both as to the law and the fact.

The Circuit Court also held that the state selections were void for the reason that the act of 1853, under which they were made, excepted from selection by the State, in lieu of school sections lost, "lands reserved by competent authority," and "lands claimed under any foreign grant or title," and "mineral lands;" and that these lands were excepted because at the time of their selection, location and sale by the State they were claimed under a Mexican grant known as "Las Pocitas." Appellants contended that this conclusion was based on a mistaken construction of the act of 1853, and an erroneous application of the act, if properly so construed, under the facts in the case.

Among the points raised upon the demurrer and necessarily presented upon the final hearing, were these: first, whether the United States had such an interest in the subject matter of the controversy as warranted their filing the bill; second, whether the claim set up was not barred by laches and limitations.

The bill averred that the United States had granted the land to the railroad company; that the railroad company was entitled to a patent; that the lands had been wrongfully listed to the State, and for that reason the United States refused to grant a patent for the same; and therefore the bill was filed to enable the government to issue the patent. But it was also alleged that the Western Pacific Railroad Company and its successor, the Central Pacific Railroad Company, did within three years of the completion of the road, sell and dispose of the land hereinbefore described to persons other than defendants. The road was completed December 29, 1869, so that the sale of the land by the railroad company to others than the defendants must have been before January, 1873, or nine and one-half years before the original bill was filed.

The rule in relation to the institution of suit by the Attorney General of the United States to vacate a patent is thus stated by Mr. Justice Miller in *United States* v. *San Jacinto Tin Company*, 125 U. S. 273, 285:

"But we are of opinion that since the right of the government of the United States to institute such a suit depends upon the same general principles which would authorize a private citizen to apply to a court of justice for relief against an instrument obtained from him by fraud or deceit, or any of those other practices which are admitted to justify a court in granting relief, the government must show that, like the private individual, it has such an interest in the relief sought as entitles it to move in the matter. If it be a question of property, a case must be made in which the court can afford a remedy in regard to that property; if it be a question of fraud which would render the instrument void, the fraud must operate to the prejudice of the United States; and if it is

apparent that the suit is brought for the benefit of some third party, and that the United States has no pecuniary interest in the remedy sought, and is under no obligation to the party who will be benefited to sustain an action for his use; in short, if there does not appear any obligation on the part of the United States to the public, or to any individual, or any interest of its own, it can no more sustain such an action than any private person could under similar circumstances.

"In all the decisions to which we have just referred it is either expressed or implied that this interest or duty of the United States must exist as the foundation of the right of action. Of course this interest must be made to appear in the progress of the proceedings, either by pleading or evidence, and if there is a want of it, and the fact is manifest that the suit has actually been brought for the benefit of some third person, and that no obligation to the general public exists which requires the United States to bring it, then the suit must fail. In the case before us the bill itself leaves a fair implication that if this patent is set aside the title to the property will revert to the United States, together with the beneficial interest in it."

And in *United States* v. *Beebe*, 127 U. S. 338, 342, it was said by Mr. Justice Lamar, delivering the opinion of the court: "If a patent is wrongfully issued to one individual which should have been issued to another, or if two patents for the same land have been issued to two different individuals, it may properly be left to the individuals to settle, by personal litigation, the question of right in which they alone are interested. But if it should come to the knowledge of the government that a patent has been fraudently obtained, and that such fraudulent patent, if allowed to stand, would work prejudice to the interests or rights of the United States, or would prevent the government from fulfilling an obligation incurred by it, either to the public or to an individual, which personal litigation could not remedy, there would be an occasion which would make it the duty of the government to institute judicial proceedings to vacate such patent."

In the case before us, the State of California and its grantees

claimed title under the United States, as did the railroad company and its grantees. Either the grantees of the State or the grantees of the railroad had, when the bill was filed, the title to the land. No fraud or imposition or wrong as against the United States was charged, and no case made upon which the United States sought relief for themselves. Nor was the case one of mistake, in the sense that the action of the United States and the State would not have been what it was but for ignorance of particular facts or of the law. If the State acquired the legal title by the listings, that legal title passed to its grantees, and if the railroad company and its grantees acquired an equitable title, no reason is perceived why the real parties in interest could not litigate their claims as between each other. And this was equally true if the State's selections and the listings were wholly void. No wrong was chargeable to the State, and if the State and railroad company each claimed the land in good faith upon mere questions of law and fact, without any element of wrong or fraud, it does not appear to us that the bill should be regarded as accomplishing anything more than raising a controversy between the parties actually in interest.

Under the railroad grant acts themselves, nothing contained therein was to impair or defeat any valid claim existing at the time the line of the road was definitely fixed ; and upon the face of this record there can be no question that the claim of the State of California, based upon its making selections of the lands and presenting the same for approval, was a claim in good faith, and the obligation of the United States to the State was as much to be considered as the obligation to the railroad company, and its liability to make good the loss was to that one of the parties upon whom the loss might finally fall.

We are of opinion that upon the case made, the same principles must be applied as if the litigation were between private parties.

In this regard, the case of *United States* v. *Beebe,* 127 U. S. 338, is exactly in point and of controlling weight. There a *bona fide* claimant had made a location under a New

Madrid certificate, perfected his claim, and received a certifi-
cate upon which he had become entitled to a patent for the
land.    Afterwards, and while the matter was pending, Beebe
and others, as was alleged, by some imposition or fraud pro-
cured a patent to be issued to them for the same land.    Suit
was permitted to be brought in the name of the United States
to cancel the Beebe patent, and the defences relied on in the
court below were (1) the want of authority in the Attorney
General to file a bill for an annulment of a patent in a case
like that ; (2) that the claim was barred by the statute of
limitations; (3) that the claim sued on was stale; (4) that the
complainant had no equity to maintain the suit.    It was held
by this court that the United States could properly proceed
by bill in equity to have a judicial decree of annulment and
an order of cancellation of a patent issued by mistake, or pro-
cured by fraud, where the government had a direct interest
or was under an obligation respecting the relief sought; but
that, in the language of Mr. Justice Lamar, "when the
government is a mere formal complainant in a suit, not for
the purpose of asserting any public right or protecting any
public interest, title, or property, but merely to form a con-
duit through which one private person can conduct litigation
against another private person, a court of equity will not be
restrained from administering the equities existing between
the real parties by any exemption of the government designed
for the protection of the rights of the United States alone.
The mere use of its name in a suit for the benefit of a private
suitor cannot extend its immunity as a sovereign government
to said private suitor, whereby he can avoid and escape the
scrutiny of a court of equity into the matters pleaded against
him by the other party ; nor stop the court from examining
into and deciding the case according to the principles govern-
ing courts of equity in like cases between private litigants.
These principles, so far as they relate to general statutes of
limitation, the laches of a party, and the lapse of time, have
been rendered familiar to the legal mind by the oft-repeated
enunciation and enforcement of them in the decisions of this
court.    According to these decisions, courts of equity in gen-

eral recognize and give effect to the statute of limitations as a defence to an equitable right, when at law it would have been properly pleaded as a bar to a legal right."

The decision of the Circuit Court in that case dismissing the bill on the ground of laches was sustained, because, although Beebe had procured his patent by fraud and imposition upon the government or its officers, and the superior right to the land was originally in others, yet it was apparent that the suit was prosecuted in the name of the United States only on behalf of private persons, and therefore should be barred if they were.

Tested by this rule, it is clear that the claim of the railroad company and its grantees cannot be sustained.

The grant was *in præsenti*, and attached upon the filing of a map of definite location. When the identification of a granted section became so far complete as to authorize the grantee to take possession, the legal title of the granted land passed, and an action for possession could be maintained by the company or its grantees before the issue of a patent. The patent would have been evidence that the land named was granted, that the grantee had complied with the conditions of the grant, and that the grant was to that extent relieved from the possibility of forfeiture for breach of its conditions, but was not essential to transfer the legal right. *Deseret Salt Company* v. *Tarpey*, 142 U. S. 241; *Sioux City Company* v. *Griffey*, 143 U. S. 32.

The company had, on February 1, 1870, whatever title it could obtain, and whatever rights belonged to it, and its cause of action then accrued. The land had already been certified to the State by the Commissioner of the General Land Office and the Secretary of the Interior, and their action in that regard was in law the same as if patents had been issued to the State. *Frasher* v. *O'Connor*, 115 U. S. 102.

If that action was wholly void, then it was open to collateral attack, and the railroad company and its grantees could have brought suit to test the legal title at once. *Doolan* v. *Carr*, 125 U. S. 618.

If that action was not void, but the Interior Department had taken mistaken views of the law, or drawn erroneous con-

clusions from the evidence, and the railroad company and its grantees possessed such equities as would control the legal title vested in the State and its grantees, then resort could have been had to a court of equity for relief. *Smelting Co.* v. *Kemp,* 104 U. S. 636.

In either aspect, the rights of the parties could have been determined by proceedings on behalf of the company or its grantees against the patentees of the State or their grantees; but instead of instituting such proceedings, the railroad company besieged the principal officers of the Land Department to ignore the action of their predecessors in office, and to exercise a power that had become *functus officio.* *Noble* v. *Union River Logging Railroad,* 147 U. S. 175. If patents had been issued to the railroad company, then the case would have been presented of two patents for the same land issued to two different parties, and, as pointed out in *United States* v. *Beebe,* the matter might properly be left to those parties to settle by personal litigation.

This bill was not filed until more than thirteen years after the cause of action had accrued, and twelve years after the first patent, and over five years after the last patent, was issued, by the State, while the selections and purchases thereunder were made long before.

Under the laws of California, an action may be brought by any person against another, who claims an estate or interest in real property adverse to him, for the purpose of determining such adverse claim; but no action can be brought for the recovery of real property or for possession thereof, or arising out of the title thereto, unless such action is commenced within five years after the cause of action shall have accrued; and an action for relief not otherwise provided for must be commenced within four years. (Code Civ. Proc. Cal. §§ 318, 319, 343, 738.)

Whether the statute be applied directly or by analogy, or the rule in equity founded upon lapse of time and staleness of claim, the delay and laches here are fatal to the maintenance of the suit.

The ineffectual pressure of the company on the Land De-

partment furnished no excuse as between the real parties. to this litigation, and the United States occupied no such relation to the case as to be entitled to the exemption from limitation and laches accorded to governments proceeding in their own right.

If through erroneous action of its officers, the bounty of the government in the particular instance has not reached those for whom it was intended, but has .reached beneficiaries who were not intended to have these particular lands, the government may be relied on to effectuate its own designs, and to make good any moral obligation that rests upon it; but it had not such. pecuniary or other interest in this litigation as entitled it to ask the suspension of the beneficent rules applied by the courts in the administration of justice between individuals.

*The decree is reversed and the cause remanded with a direction to dismiss the bill.*

MR. JUSTICE FIELD dissenting:

I am not able to agree with the majority of the court in their decision of this case. The lands in controversy fall within the limits of the grant to the Central Pacific Railroad Company; but by mistake and inadvertence of the Land Department they were listed to the State of California. Discovering its mistake, the department refused to issue to the company a patent for the lands to which it was entitled, until the erroneous listing to the State was set aside and annulled. The present bill was filed by the Attorney General for that purpose — and because of this proceeding and the delay of the company in waiting on its issue — instead of taking steps to enforce its rights at law for the land, this court now holds that it has lost the right to them; and that as the United States have no interest in the property, except to clear it of the cloud of the listings wrongly made, they cannot maintain the suit. The result, which produces simple injustice to the railroad company without wrong on its part, ought not in my judgment to be upheld.

In *United States* v. *Hughes*, 11 How. 568, a patent had been issued by mistake to Hughes in disregard of the prior rights of one Goodbee and of parties deriving title under him. The United States filed an information in the nature of a bill in equity against Hughes for the repeal and surrender of his patent, on the ground that its existence impaired the ability of the government to fulfil its engagements to Goodbee. The case was before this court originally on demurrer, and it was held that the court had jurisdiction to annul the patent thus improvidently issued. When here a second time (4 Wall. 232) the court, reaffirming its first decision, said: "When this case was here on demurrer the patent was considered by the court to be a valid instrument, conveying the fee of the United States, and, until annulled, as rendering them incapable of complying with their engagement to Goodbee or his alienees. Whether regarded in that aspect, or as a void instrument, issued without authority, it *prima facie* passed the title, and, therefore, it was the plain duty of the United States to seek to vacate and annul the instrument, to the end that their previous engagement might be fulfilled by the transfer of a clear title, the only one intended for the purchaser by the act of Congress. The power of a court of equity, by its decree to vacate and annul the patent, under the circumstances of this case, is undoubted. Relief, when deeds or other instruments are executed by mistake or inadvertence of agents, as well as upon false suggestions, is a common head of equity jurisprudence."

Upon this doctrine the court below proceeded in this case, in order that the government might discharge its obligation to the railroad company. It is a case where the government admits the error of its officers of the Land Department, acknowledges its obligation to correct it, and seeks to remove from its records the inadvertent and erroneous certification to the State of the lands, so that it may be able to issue a clear title to the railroad company; the right of that company having been finally determined, and thus carry out the pledge of its grant.

There was at no time an admission by the railroad company

of the correctness of the original action of the Land Department, or any acquiescence therein, but, insisting always upon the error of its proceedings, the company urged upon the department to correct them and issue to it the patent which the law authorized.

The case is not, in my judgment, within the doctrine of *United States* v. *Beebe*, 127 U. S. 338, which would exclude the interference of the United States, but is within the doctrine which there recognizes and upholds it. In that case the original claimant had rested on the action of the Land Department, and sought the assistance of the United States only after the lapse of nearly half a century, and it was held that the interference of the government, after such a lapse of time, was simply a proceeding to avoid the laches of the claimant and to give to him the benefit of its exemption from them. But it declared that a suit of the United States would lie to set aside a patent where the government was under an obligation respecting the relief invoked. In this case the railroad company has not remained inactive, but upon a decision in its favor by the department, asked for its promised patent, which was only withheld because of the previous inadvertent and mistaken action of the government's officers in issuing a certificate to the State. In such circumstances the government, it seems to me, ought not to be debarred the right to correct the mistake of its officers, by which alone the intention of the law was defeated. I think the decree below should be affirmed.