**ROBINSON v. LINFIELD COLLEGE (STATE OF WASHINGTON et al., Intervenors).**

**No. 184.**

District Court, E. D. Washington, N. D. Dec. 5, 1941.

O. C. Moore and H. M. Dunphy, both of Spokane, Wash., Frederick M. DeNeffe, of Portland, Or., and W. C. Losey, of Spokane, Wash., for plaintiff.

Graves, Kizer & Graves and James A. Williams, all of Spokane, Wash., for defendant.

Rudolph Naccarato, Sp. Asst. Atty. Gen., for intervenor State of Washington.

Witherspoon, Witherspoon & Kelley, of Spokane, Wash. for intervenor Leona P. Sanderson.

SCHWELLENBACH, District Judge.

Plaintiff brings this action as administrator de bonis non of the consolidated estates of Edward S. Ross, who died in 1915, and Mary C. Ross, who died in 1918. The purpose of the action is to recapture for the estates title to a piece of downtown real estate in the City of Spokane, the title to which the Rosses conveyed in 1913 to the Ross Holding Company, a corporation, and which, in turn, was conveyed by the Ross Holding Company to a Mrs. Frances E. R. Linfield in 1916 and which was conveyed in 1922 by her to the defendant. The defendant is a denominational school founded and partially supported by the Baptist Church. It is located at McMinnville, Oregon. With the consent of both parties, the State of Washington intervened for the purpose of collecting unpaid license fees of the Ross Holding Company. I permitted the intervention of Leona P. Sanderson who is the surviving widow of and successor in interest to one Lee F. Hammond who, on February 1, 1928, entered into a contract of purchase of the property involved herein for the sum of $100,000. Since that contract was entered into with the defendant, payments on it have been made by Hammond and the intervenor sufficient to reduce the amount payable thereunder to $32,000. The theory of plaintiff's compliant is that the facts and circumstances under which Mrs. Linfield acquired title in 1916 were such as to impose upon that title a constructive trust which would enable the plaintiff to recapture the title as against the defendant and the intervenor. The very nature of this action is such as to require a detailed recitation of the facts.

Plaintiff's decedents moved to the West in the early days. They homesteaded successfully and acquired considerable property. They had five children. All of them are now dead except Edna Ross. Of the sons, Elwyn and Linfield took the leading positions. In 1913, as the father and mother were approaching the age of ninety, these two sons joined with their father in the formation of the corporation Ross Holding Company. Linfield Ross became president, and Elwyn Ross, secretary-treasurer. Plaintiff's decedents offered to and

did sell to the company a large amount of real estate located in Rossvale Addition to Spokane and Rossvale Second Addition to Spokane, miscellaneous other pieces of property, real estate contracts, accounts receivable, all of which was listed as having a value of $370,000. Included among the property was this one downtown piece of property which was listed at $135,000. The corporation agreed to assume the liabilities against the property in the form of mortgages, notes and accounts in the amount of $89,000. Included among these obligations was the mortgage on the property here involved in the amount of $50,000. The property was sold to the corporation in consideration for the issuance of corporate stock in the amount of $250,000. The corporate minutes do not disclose to whom the stock was issued. No stock certificate book has been found. The corporate records were very fragmentary. The minute book which was introduced in evidence only showed minutes of 8 meetings of the Board of Trustees between August 8, 1913, and January 5, 1918. One of the witnesses for the plaintiff testified that there were many other meetings of which he had personal knowledge.

The fact that plaintiff's action is based upon a charge of fraud made against Frances E. R. Linfield makes necessary a rather complete examination of her life. Mrs. Linfield was born in New Jersey in 1852. She was educated in private schools in Rochester, New York, and later graduated from Elmira College. She taught school for five years. In 1878, she married Reverend George F. Linfield, a Baptist Minister, and moved to Moline, Illinois. In 1884, both Mrs. Linfield and her husband commenced teaching at Wayland Academy in Beaverdam, Wisconsin. They remained there until 1890 during which year Mr. Linfield died. They had no children. Mrs. Linfield remained on the faculty of the Academy for four years when she went to the University of Chicago to study for the degree of Doctor of Philosophy. In 1895, she came to Spokane where she became head of the Department of Foreign Languages at the old South Central High School. She retained that position until 1912. She took an active part in the work of the Baptist Church and also in the work of the Deaconess Hospital. During the years she acquired a number of pieces of property. Mrs. Linfield's relationship with the other members of her family was an unusual one. The testimony is replete with evidences of the respect and admiration which the other members of the family had for her. She was consulted and her advice sought on all the family problems. She was by far the best educated member of the family and her business acumen was recognized by them. "Aunt Franc," as she was referred to by one of the witnesses, became what counsel for plaintiff, in his argument, referred to as the "matriarch" of the family. Even up to the last year of her life, after the sharp controversies which existed as a result of the transaction involved in this case, she wrote many checks for varying amounts up to $100 for her relations. It is apparent to me that Mrs. Linfield occupied that most unfortunate of positions—she was the family leader and favorite to whom all of the relatives looked for advice and assistance and whose fortune they secretly hoped to inherit upon her death. Any person occupying this position must brave the most vigorous wrath when he decides that the time has come in his life to cut loose from the ties of such family responsibility.

On December 7, 1910, plaintiff's decedents executed to the German Savings and Loan Society a mortgage on the property here involved in the amount of $50,000 payable December 7, 1915, with interest payable quarterly, which mortgage contained the usual provisions requiring payment of taxes. The taxes were not paid for the years 1912, 1913, 1914, or 1915. The September, 1915, payment of interest was not made and no payment was made on the principal when due. Consequently, on September 26, 1916, in this court mortgage foreclosure proceedings was commenced against the Ross Holding Company, Mary C. Ross, individually, and as administratrix of the estate of Edward S. Ross. Judgment was asked against each of the defendants for $53,353, for the principal and interest and $5,871 taxes which had been paid by the mortgagee prior to the commencement of the action. In the complaint, an allegation was made to the effect that the assets of the Ross Holding Company were being dissipated through improper management, and a receiver was asked for the company. The Ross Holding Company was without funds with which to pay the obligation. The testimony shows that there were discussions concerning the company's position both at this time and for about a year previous. In those discussions, Mrs. Linfield participated. At that time, she was a member of the Board of Trustees of the Hold-

ing Company. Testimony shows that El-wyn Ross and Linfield Ross went to the Old National Bank and attempted to arrange through the bank for a loan with which to pay off the mortgagee. A Mr. Kommers testified that he was the party with whom they dealt at the bank. He investigated the property and found that the income from it was not sufficient to carry a mortgage of the size necessary to repay the mortgage and so advised the Rosses without even referring the matter to the loan committee at the bank. On October 4, 1916, Ross Holding Company, by its officers Linfield S. Ross as president and Elwyn G. Ross as secretary, executed to Mrs. Linfield a deed to the property. The deed recited a consideration of $75,000 and provided that Mrs. Linfield assume and agree to pay the mortgage which was being foreclosed. On October 5, 1916, Mrs. Linfield executed a mortgage on this property and another piece of property which she owned to the Spokane and Eastern Trust Company for $65,000. She paid the German Savings and Loan Society mortgage on October 6, 1916.

On January 15, 1918, Mrs. Linfield resigned as a trustee of Ross Holding Company. On January 20, 1918, an action was commenced by Linfield S. Ross against the Ross Holding Company and Ross Investment Company asking for the appointment of a receiver. In his affidavit he alleged that the affairs of the two corporations had become mixed and confused, that interest, taxes and assessments on properties owned by the Holding Company had not been made and become delinquent, that many suits had been started against the Holding Company and that a receiver was necessary to protect the interests of the corporation and its stockholders and creditors. A receiver was appointed on February 21, 1918, giving a bond in the amount of $7,500. That receiver was the Spokane and Eastern Trust Company. The testimony of the trust officer of the bank shows the claims against the corporation filed in the amount of $15,526.34, on which payments were made by the receivership equalling 28.78%. He testified that most of the property held by the corporation was mortgaged for more than its value and that on most of the properties, taxes were delinquent at least three years. The bank attempted to salvage property until 1926, at which time the receivership was closed.

Shortly after the receiver was appointed, discussion arose as to the fact that Mrs. Linfield had taken the most valuable property which the corporation owned. Mrs. Linfield was called to the bank and on April 10, 1918, she wrote a letter to the bank in which she stated that she had learned that there had been talk about the transaction. She then outlined the circumstances and her position in the matter. I felt constrained to reject that letter when it was offered in evidence as being hearsay and a self-serving declaration. I did, however, admit the portion of the letter in which she made an offer to the receiver that she would, at any time within the period of three months, relinquish the property for the amount that she had in it if the bank felt that there was anything unfair in the transaction. The bank's officers, after investigation, concluded that the property was not worth the amount of the mortgage and declined Mrs. Linfield's offer. At that time, the annual charges against the property, including taxes, insurance, interest, street lights, etc., were $5,325.50, total income was $3,320, leaving an annual deficit of $2,005.50.

In 1917, Mrs. Linfield was elected to the Board of Trustees of the defendant college. She had met the president of the college in 1908 and had been on the mailing list of the college and familiar with its activities since that time. In April, 1918, she proposed to the president and treasurer and the president of the Board of Trustees of the college to make a gift to the college of the four pieces of real estate which she owned in Spokane on condition that the name of the institution be changed from McMinnville College to Linfield College. On April 27, 1918, she went to Seattle where she consulted with Mr. Corwin S. Shank, an attorney in that city, who for many years had been active in the affairs of the Baptist Church and he drew up for her a will leaving the property to the college upon her death. Thereafter, and about a year later, she executed a deed to the property and delivered it to the president of the college and took from him a contract to the effect that the deed would become effective upon the changing of the name of the college, title to date back to the date of the execution of the deed on June 30, 1919. These transactions were kept secret from everyone. In September, 1921, Mrs. Linfield became Dean of Women at the college, serving without compensation. She lived at the residence of the president of the institution. At that time, she was 69 years of age. She managed the properties and had succeeded by that date

152

in reducing the amount due upon the mortgage to $25,000. At some time prior to January 10, 1922, Mrs. Linfield and the college president decided that the transaction should be made public and on that date the president announced it to the Board of Trustees and to the students. The total value of the gift was estimated to be somewhere between $200,000 and $300,000. Thereafter, on February 11, 1922, Mrs. Linfield deeded the four pieces of property to defendant. The name of the college was changed to Linfield College and a contract was entered into under the terms of which Mrs. Linfield was to manage the property during her lifetime and to receive sufficient income therefrom on which she could live during the remainder of her life.

The announcement of this gift received considerable publicity through the press. The members of the family soon learned of it. There followed a very active letter-writing campaign by the relatives and their friends. Mostly, the letters could be termed vicious. They were addressed to the college, to the trustees and to Mrs. Linfield. It is apparent from the similarity of wording of the letters that many of them were prepared by the same person. In fact, the carbon copies introduced by plaintiff at the trial present conclusive proof of this fact. There can be no question that each one of the principals who might, directly or indirectly, be heirs of plaintiff's decedents had knowledge in the spring of 1922 of the transaction between Mrs. Linfield and the defendant. The plaintiff's witness Lewis testified that, after the announcement, both Elwyn Ross and Linfield Ross discussed the transaction with his brother Will Lewis who for years had been an attorney for the Ross family and the Ross Holding Company. It was Will Lewis who prepared the deed by which title was transferred from the Ross Holding Company to Mrs. Linfield. He was fully familiar with the transaction from its inception. The witness Lewis testified that the Rosses discussed with his brother Will the question of taking action to recover the title of the property involved herein from the defendant. No such action was started.

William S. Lewis was appointed administrator of the estate of Mary Ross on January 27, 1919, and on the same date was also appointed as administrator de bonis non of the estate of Edward S. Ross, and qualified for those positions on the same day. The estates were never closed although, on February 18, 1924, the final report and account of William S. Lewis, joint administrator, and petition for distribution and discharge was filed. At no place in the estate did administrator Lewis refer to the property herein involved or assert any claim or interest that estate might have in the property. His final report showed assets on hand of only $198.82. At some time after that date, Mr. Lewis moved to Los Angeles, California, where he died on March 17, 1941. It was not until April 15, 1941, that the plaintiff was appointed as administrator and immediately thereafter, on April 21, 1941, this action was commenced.

The testimony shows that through the years Mrs. Linfield maintained a fairly friendly relationship with many members of her family. She visited with Edna Ross and Mrs. Dunphy in California and they visited her in Portland. She came to Spokane, on one occasion, with Edna Ross. In 1932, because of Edna Ross' sickness, Mrs. Dunphy prevailed upon Mrs. Linfield to go to California, that despite the fact that Mrs. Linfield was 80 years of age. During the last years of her life, Marshall Ross, a brother of Mrs. Dunphy, lived with Mrs. Linfield in Portland. He received substantial payments from her almost every month.

It is further pertinent to note that, in the requirements fixed by Mrs. Linfield with the defendant, she stipulated that $8,000 of the money received by the defendant should be held in trust in a fund to be known as the Betsey Ross Memorial Scholarship Fund, the income from which should be used to provide scholarships for deserving young women. Another stipulation required the holding in trust of the sum of $7,800 for the education in the preparatory and collegiate departments of defendant of Albert Francis Ross, Marshall Browne Ross and John J. Ross, children of George Marshall Ross, each of such children to receive $300 per year for each of the four years of the preparatory course and $350 per year for each of the four years of the collegiate course.

It is also worth noting that Mrs. Dunphy, who lived with Mrs. Linfield during her early life, and who upon her marriage received $1,200 from Mrs. Linfield, was married during all of this period to H. M. Dunphy, a lawyer, and that he was present in Los Angeles during the 1932 discussions with Mrs. Linfield about the future of Edna Ross.

All of the principals in this action and all of the principals who might have first hand information concerning the transaction with one exception are now dead. Elwyn and Linfield Ross are dead; the other brothers have passed away, the attorney for the Ross Holding Company and the Ross estates, Mr. Lewis, died as did Mr. Rosslow, the attorney for Linfield Ross in the receivership deal. Mrs. Linfield died at the age of 89 on March 26, 1940. And there was no evidence offered by the plaintiff tending to explain why the commencement of this action was delayed for a period of 19 years after the parties who might have been interested became aware of Mrs. Linfield's deed to the defendant.

Plaintiff commences this action on the following theories:

1. That a constructive trust was created because of Mrs. Linfield's representations prior to the execution of the deed of October 4, 1916, that she would take the property and protect it for the benefit of the Ross family, such representations being made with the then intent not to carry out the promise involved.

2. That by reason of Mrs. Linfield's position in the Ross family and the confidence imposed in her by her relations, there was created such a trusteeship on her part that the court would be compelled to assume that any property she took from the Ross family was taken by her in trust for the family.

3. That Mrs. Linfield took the property in trust by virtue of her position as a member of the Board of Trustees of the Ross Holding Company.

4. That, at the time of the execution of said deed, the Ross Holding Company was insolvent and its assets constituted a trust fund for the benefit of its creditors and its stockholders.

5. That the defendant imposed upon Mrs. Linfield and took advantage of the confidential relationship which existed between her and the officers of the defendant corporation.

Defendant resists all of the claims of fraud and trusteeship and pleads the statutes of limitation of the State of Washington and the further defense of laches.

Before discussing in detail the contentions of either party, I feel I should express generally my conviction after full consideration of all the evidence. I am convinced that Mrs. Linfield was guilty of no fraud.

A person does not live to the age of 69 with a background of religious, educational activity, with a devotion to her family, giving of her time and money to charitable endeavors and suddenly, at that age, become a defrauder. The record shows conclusively that even up to the time of her death and even after the attacks upon her in 1922, she still affectionately cared for and provided for the members of her family and that provision extended down even to her grandnieces and grandnephews. There is nothing in the record to show that, in the 1916 transaction, Mrs. Linfield unduly influenced her two nephews, who at the time were grown men experienced in business affairs. It is apparent to me that all the members of the Ross family had a greatly exaggerated idea of the value of the estate of the plaintiff's decedents and that they must have been greatly shocked to find that they had no inheritance. For example, when the Ross Holding Company was formed in 1913, the property sold to it by plaintiff's decedents was listed as having a value of $370,000 with liabilities of only $89,000. Yet the record shows that even at that time there were two years of unpaid taxes upon the property involved here and that two years after the formation of this corporation it was unable to pay the interest due on the mortgage. Eliminating this piece of property from the assets of the corporation, the 1913 appraisals showed $235,000 of property as against only $39,000 of liabilities. Yet, when the company went into receivership in 1918 owing obligations of only $15,000, the receiver was only able to pay upon those obligations something less than $5,000. This net worth of $196,000 which the Rosses believed they had in 1913 was not all lost in that five-year period. The fact was that, while plaintiff's decedents had a large amount of real estate and scores of pieces of property, that real estate had little if any value. There was nothing secret or collusive about the transaction in 1916. The testimony of plaintiff's witnesses shows that a discussion as to what should be done to protect the Ross family went on for a period of about a year and the transaction, itself, according to witness Lewis, was agreed upon about ten days before it was consummated.

As a practical matter, no one can doubt that a deficiency judgment would have been procured not only against the Ross Holding Company but also against Mary C. Ross. The ledger sheets of the company show that throughout the entire period of

the ownership of this property it failed to earn enough to pay the expenses of upkeep and the carrying charges upon the mortgage without even considering the payment of taxes. The passage of time and the death of the parties makes it impossible for me to know exactly what occurred. However, I am able to learn sufficient facts to convince me that the Ross family was defrauded out of nothing by Mrs. Linfield. This, for the reason that they had no possible equity in this property which they could protect. Both the corporation and the mother were faced with the certainty of a substantial deficiency judgment. Had it not been that Mrs. Linfield combined this property with another piece which she, personally, owned and borrowed enough upon both of them to pay off this mortgage, the Ross Holding Company would have been in receivership in 1916 instead of 1918.

Counsel for plaintiff contends that the recital in the deed of the consideration of $75,000 was false. Had the Ross heirs not waited until after everyone was dead to commence this action, we would have been able to reach some conclusion upon that question. To my mind, it makes no difference, however, because the relieving of the certainty of the deficiency judgment was, in itself, a good and valid consideration.

 1. The testimony concerning plaintiff's first contention was given by the witness Marshall Lewis. He had worked in his brother's office as a typist, process server and general assistant. He was not a lawyer. At the outset plaintiff's counsel conceded that his testimony as to conversations between the Rosses and Mrs. Linfield prior to the execution of the deed was not admissible for the purpose of proving an express trust. That concession came as a result of defendant's objection that the testimony violated the parol evidence rule. The testimony was offered, however, according to plaintiff's counsel to lay the basis for the establishment of a constructive trust. Plaintiff contended and still contends that testimony as to representations made by the grantee that she would hold the property in trust for the stockholders of the grantor when she had no intention to so hold the property results in the creation of a constructive trust on behalf of the grantor. Under that theory, I permitted the evidence to be introduced. The defendant does not deny this to be the law. However, in order for the trust to be created there must be clear and convincing evidence not merely of the representations but also of the intention at the time not to fulfill the represented promise. If that were not true, the rule barring the introduction of parole evidence to create an express trust would be a nullity. As the Supreme Court of Washington said in Pacheco v. Mello, 139 Wash. 566, 247 P. 927, 932: "The law seems well settled that a mere subsequent breach of any such promise will not give rise to any trust interest in the property in favor of the grantor, whatever money obligation may arise therefrom and rest upon the grantee to the grantor because of failure on the part of the grantee to fulfill some promise made in connection with or as a part of the transaction resulting in the conveyance of the property to him."

There is no evidence which even tends to prove that if Mrs. Linfield did agree, as Lewis testified, that at that time she did not intend to carry out her agreement. I will say frankly that I have great difficulty in accepting the testimony of the witness Lewis upon this point. He was testifying to conversations which occurred twenty-five years ago. On all other questions as to what occurred at that time, he was very hazy and indefinite. On this one point he was very certain. But even accepting his testimony, there is a complete failure of proof on the other necessary element to prove a constructive trust. The only other evidence in the case which might be deemed to touch upon this point is that of the officers of the Spokane and Eastern Trust Company that, in 1918, Mrs. Linfield offered to reconvey the property upon the repayment to her of the amounts she had advanced. Even if I were compelled to find Mrs. Linfield made the promises to which Lewis testified, I would also be compelled to find that as late as April 10, 1918, Mrs. Linfield intended to carry out the promises which Lewis said she made.

 In addition, the plaintiff offered the testimony of several witnesses as to statements they claimed Mrs. Linfield made herself later about the transaction. Objection was made to the introduction of these statements on the ground that they were hearsay and an effort to prove that Mrs. Linfield, who as between herself and the defendant was the grantor, was attempting to impeach the title of her grantee. With the hope that the testimony might be found admissible as the result of other testimony,

I permitted the witnesses to thus testify. I am satisfied that that ruling was erroneous. The statements of the grantor in a deed made after execution and delivery are not admissible to invalidate the grantee's title unless the grantee acquiesces in or sanctions them. Julien v. Herren, 149 Wash. 573, 271 P. 891; Steinbach v. Stewart, 11 Wall. 566, 20 L.Ed. 56; Ruckman v. Cory, 129 U.S. 387, 9 S.Ct. 316, 32 L.Ed. 728.

Furthermore, the testimony of these other witnesses did not support plaintiff's position upon the one vital question concerning Mrs. Linfield's intention at the time the deed was executed.

■ 2. What I have said in my general statement concerning the facts fully covers plaintiff's second contention. Plaintiff has cited many cases and quoted from many opinions concerning the vigilance and the care that the courts exercise in protecting the rights of those who have been imposed upon by others who occupy toward them a fiduciary relation. I see no value in discussing them all. It is my opinion, after reading the cases and the quotations, that the statement by Chief Judge Cardozo made when serving in the Court of Appeals of the State of New York in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1, is not only the best but the strongest statement of the rule. "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending an inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

Accepting Judge Cardozo's statement as the measuring stick in analyzing the testimony of this case, I am fully convinced that no trust resulted from the relationship between Mrs. Linfield and the Ross family rising out of the transaction of October 4, 1916.

3. Plaintiff's next contention is that because Mrs. Linfield was a member of the Board of Trustees of the Ross Holding Company, she took title to this property as trustee as a matter of law. Plaintiff's argument upon this point is based upon the language of certain decisions in which the courts have said that trustees or directors of corporations occupy a fiduciary relationship. The plaintiff then quotes from Buffum v. Peter Barceloux Co., 289 U.S. 227, 53 S.Ct. 539, 543, 77 L.Ed. 1140, in which Justice Cardozo said: "The standard of duty is no different whether the trust to be enforced is actual or constructive. * * * The implication of a trust is the implication of every duty proper to a trust. * * * Whoever is a fiduciary or in conscience chargeable as a fiduciary is expected to live up to them."

Having advanced these two steps, plaintiff then relies on Alexander v. Hillman, 296 U.S. 222, 56 S.Ct. 204, 210, 80 L.Ed. 192, in which the Supreme Court said: "All trusts, those implied as well as those expressly created, are within the jurisdiction of courts of equity."

Plaintiff then concludes from these premises that it is the duty of this court to construct a trust and return the property to the heirs of plaintiff's decedents.

■ The fallacy of plaintiff's argument is pointed out in a statement by Mr. Justice Lurton found in the text in Fletcher Cyclopedia Corporations, Permanent Edition, Vol. 3, Sec. 838. There Justice Lurton said that the statement that " 'directors are trustees' is rhetorically sound but technically inexact. It is a statement often found in opinions but is true only to a limited extent. They are mandatories. They are agents. They are trustees in the sense that every agent is a trustee for his principal and bound to exercise diligence and good faith." Wallace v. Lincoln Sav. Bank, 89 Tenn. 630, 15 S.W. 448, 24 Am. St. Rep. 625.

The plaintiff cites Parsons v. Tacoma Smelting & Refining Co., 25 Wash. 492, 65 P. 765, 767, and relies upon the language of the opinion in which it is said: "Each [trustee] occupies a fiduciary relation to the corporation and to each stockholder. He must faithfully perform his trust. The ordinary obligation attending trust relations attaches to the trustee of a corporation."

While that language is used in that opinion, what the Supreme Court actually held

156

in that case was that when a director of a corporation is transacting business on his own behalf with the corporation, he cannot vote upon the proposition in which he is personally involved and a quorum of the Board of Trustees must be present without depending upon his presence to constitute a quorum.

The rule was later recognized in this State in Hein v. Forney, 164 Wash. 309, 2 P.2d 741, 78 A.L.R. 631, where the Tacoma Smelting case was cited to that effect. The Tacoma Smelting case was also cited in Wonderful Group Mining Co. v. Rand, 111 Wash. 557, 191 P. 631, and Sacajawea Lumber & Shingle Co. v. Skookum Lumber Co., 116 Wash. 75, 198 P. 1112. In the case of Bay City Lumber Co. v. Anderson, Wash., 111 P.2d 771, 777, the Tacoma Smelting case was again cited to the effect that "The acts of a corporation, when consummated by the necessary vote of an interested trustee, are voidable upon complaint of a stockholder."

In another case—Baker v. Seattle-Tacoma Power Co., 61 Wash. 578, 112 P. 647, 650, Ann.Cas.1912C, 859, the Supreme Court used language almost identical to that used in the Tacoma Smelting case concerning the relationship between a trustee of a corporation and the corporation. It said: "The contention of appellant is that the trustees of a corporation stand in a fiduciary relation to the corporation, and are to be regarded as its agents to transact its business for the benefit of its stockholders; that, so standing and so acting, all their acts must be for the benefit of the corporation, and not for their own benefit; and, if by their acts they receive any profit from the corporation's business, equity will regard such profit as the property of the corporation."

Having thus stated the rule, the Supreme Court said: "As an abstract statement of a legal proposition, that such is the law will readily be admitted: but, like every other rule of law, it must be concreted with proper facts, before it will be announced as the law in any given case."

That is as far as the courts have gone in making voidable transactions between corporate directors and their corporations. There is no evidence here concerning the voting upon a resolution authorizing the deed to Mrs. Linfield. The minute book is silent as to the transaction. The minute book contains no by-laws which show requirements for a quorum. We do know

that the deed was executed by two of the three trustees. We know that there was nothing secret about the transaction. It was discussed by the members of the Ross family for a period of over a year. It was discussed in the company office, in the lawyer's office and at the home of Mary C. Ross. The Ross Holding Company lost nothing as a result of the transaction. As the situation stood at that time, there was nothing to indicate that Mrs. Linfield would ever profit through the transaction.

 The most decisive answer to plaintiff's contention which seems to have been overlooked by all counsel is the rule to the effect that the stockholders of a corporation can always acquiesce or ratify any action of the Board of Trustees provided they have full knowledge concerning it. It must be remembered that this is an action on behalf of the stockholders. The creditors of the Ross Holding Company, as represented by their receiver, were given full opportunity to reclaim this property in 1918 and they declined. The testimony of both Edna Ross and Mr. Lewis makes plain that the stockholders of the Ross Holding Company—that is, the members of the Ross family—were all fully familiar with this transaction and they approved it. In the case of Tefft v. Schaefer, 136 Wash. 302, 239 P. 837, 838, 1119, the Supreme Court of the State of Washington, after citing cases holding in line with the Tacoma Smelting case, said this: "But this rule of law is always subject to the exception that stockholders may ratify or acquiesce in the action of the board. It must be borne in mind that the action of the board in voting this increase was not an act that the board was without power or right to pass upon. The trustees were empowered to fix the salaries, and therefore, the act being within their powers, it was, according to the weight of authority, merely voidable and not void. 4 Fletcher Cyc. Corporations, pp. 3378–3396. * * * To our minds * * * each and all of the stockholders saw the situation, were ratifying and acquiescing therein, and the court properly held that the sale should not be set aside."

 4. Plaintiff's argument on this point is to the effect that since the Ross Holding Company, in 1916, failed to pay its annual license fee and it was stricken from the corporate records by the Secretary of State, that it was conclusively presumed to be insolvent and that, as a consequence, its assets became a trust fund for the benefit

of its creditors and stockholders. Accepting that to be the rule, it in no way follows that, under the facts of this case, the heirs of the stockholders are entitled to take the property away from those who received title through Mrs. Linfield. The directors of the corporation, facing a lawsuit in which a receiver for the corporation is asked and out of which will certainly result a substantial deficiency judgment against the corporation, undoubtedly have the right to transfer title to that property to someone who will pay the mortgage and protect the other assets of the corporation against a deficiency judgment and a receiver. State ex rel. Bowen v. Superior Court, 135 Wash. 315, 237 P. 722; Haynes v. Central Business Property Co., 140 Wash. 596, 249 P. 1057; Patterson v. Ford, 167 Wash. 121, 8 P.2d 1006.

■ 5. Plaintiff's last contention that Mrs. Linfield was imposed upon by the officers of the defendant meets headon in a destructive collision with all of the testimony of plaintiff's witnesses to the effect that Mrs. Linfield was a competent business woman who dominated and controlled the Ross family and upon whom they so much relied that in 1916 they turned this property over to her to manage for them. The Ross family matriarch of 1916 did not become the helpless victim of intrigue of the officers of McMinnville College in 1918. The testimony does not indicate that she suffered any illness during that two-year period. There is nothing to show that her mental faculties were in any way dulled during that short period of time. This contention on the part of the plaintiff is so devoid of merit that it would justify no further discussion of it.

■ Defendant has interposed three defenses, two based upon the state statutes of limitation and the third based upon the doctrine of laches. I see no need in this case to discuss the question of the relationship between the state statutes of limitation and the defense of laches. There are cases where such relationship become important. This is not one of them. I have no such feeling of doubt as plaintiff expressed in his brief as having been created by Russell v. Todd in 309 U.S. 280, 60 S.Ct. 527, 531, 84 L.Ed. 754. However, it is unnecessary to further discuss that case. This is because this case is so clearly one in which the doctrine of laches must apply. If there ever was a case in which the vigilance which equity requires should have

been exercised, it is this case. That is because of the age of the parties and the character of the business carried on by the defendant corporation. These parties knew in 1922 that Mrs. Linfield was in advanced years. They knew that a person of 72 stands a likelihood of dying within a comparatively short time. It just happened that Mrs. Linfield lived another 17 years. These parties knew that an institution like the defendant operating a small college would be much less likely to be able to adjust itself and avoid complete collapse if this suit should prevail after it had received and expended the money received from the sale of the properties received by it from Mrs. Linfield than if the suit had been promptly started in 1922 before that money had been received and expended. Yet the suit was delayed for 19 years after parties interested had knowledge of the transfer to the defendant. That meant a delay of 25 years from the date of the transaction sought to be set aside. With the exception of Marshall Lewis, there isn't a person alive today who has any knowledge about the facts of what occurred in 1916. In addition to that, these parties waited until the property in question had been enhanced in value until today it actually is worth $100,000. Plaintiff even contends that he is entitled to secure the title to this property as against Mrs. Sanderson and he asks this court, as a court of equity, to tell the intervenor Sanderson that she must look for her relief to a money judgment against Linfield College.

■ Illustrative of the unfairness and inequity of the delay is the fact that I was compelled to reject the only piece of evidence that in any way outlined Mrs. Linfield's position about this transaction. In her letter of April 10, 1918, Mrs. Linfield explained to the Spokane and Eastern Trust Company what the transaction was. I was compelled to shut my eyes to the contents of that letter except as it contained an offer to the receiver. It has been to guard against and protect against the injustices of stale demands that courts of equity have evolved the doctrine of laches. In Russell v. Todd, supra, the present Chief Justice said: "From the beginning, equity, in the absence of any statute of limitations made applicable to equity suits, has provided its own rule of limitations through the doctrine of laches, the principle that equity will not aid a plaintiff whose unexcused delay, if the suit were allowed, would be

158

prejudicial to the defendant. Wagner v. Baird, 7 How. 234, 258, 12 L.Ed. 681; Stearns v. Page, 7 How. 819, 828, 829, 12 L.Ed. 928; Philippi v. Philippe, 115 U.S. 151, 153, 157, 5 S.Ct. 1181, 29 L.Ed. 336; United States v. Beebe, 127 U.S. 338, 8 S.Ct. 1083, 32 L.Ed. 121; Curtner v. United States, 149 U.S. 662, 676, 13 S.Ct. 985, 990, 1041, 37 L.Ed. 890; Alsop v. Riker, 155 U.S. 448, 460, 15 S.Ct. 162, 166, 39 L. Ed. 218; Abraham v. Ordway, 158 U.S. 416, 420, 15 S.Ct. 894, 895, 39 L.Ed. 1036."

There are many cases from which quotations might be given concerning this doctrine. One of the best is Mackall v. Casilear, 137 U.S. 556, 11 S.Ct. 178, 181, 34 L.Ed. 776, where this language is used: "The doctrine of laches is based upon grounds of public policy, which requires for the peace of society the discouragement of stale demands; and where the difficulty of doing entire justice by reason of the death of the principal witness or witnesses, or from the original transactions having become obscured by time, is attributable to gross negligence or deliberate delay, a court of equity will not aid a party whose application is thus destitute of conscience, good faith, and reasonable diligence."

This case meets all the requirements of that rule.

Having reached these conclusions concerning the issues in this case, it is not necessary to consider the contentions of either of the intervenors.